**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leon McANDERSON, Roosevelt Hawkins, Jeff Fort, Alan Knox and Reico Cranshaw, Defendants–Appellants.**

Nos. 88–1013, 88–1014, 88–1026, 88–1027 and 88–1028.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1990.

Decided Sept. 28, 1990.

Anton R. Valukas, U.S. Atty., Ronald S. Safer, David J. Stetler, James R. Ferguson, Victoria J. Peters, Asst. U.S. Attys., Office of U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

Rick Halprin, Chicago, Ill., for Reico Cranshaw.

Marc R. Kadish, Legal Services Center, Chicago, Ill., for Alan Knox.

Allan A. Ackerman, Chicago, Ill., for Jeff Fort.

Bradley J. Harris, North Riverside, Ill., for Roosevelt Hawkins.

Bruce H. Bornstein, Freedman & Bornstein, Chicago, Ill., for Leon McAnderson.

Before BAUER, Chief Judge, MANION and KANNE, Circuit Judges.

BAUER, Chief Judge.

Defendant-appellants, all members of the Chicago street gang the El Rukns, were convicted for their various roles in a conspiracy to commit terrorist acts throughout the United States in exchange for payment from the Libyan Government. The defendants contend that the jury which returned these convictions did not represent a fair cross section of the community, was not properly questioned regarding racial and religious prejudice, and was tainted by fear for its safety due to extrinsic factors surrounding the trial. In addition, defendants contend that evidence of other bad acts, not included in the present indictment, was improperly admitted at their trial. Each of the defendants also argues that the district court improperly denied their motion for a bill of particulars concerning the use of these unindicted bad acts and the extensive

use of transcripts to decipher the code used by the El Rukns in discussing the conspiracy. Finally, two defendants, Leon McAnderson and Roosevelt Hawkins, raise separate challenges to the sufficiency of the evidence against them and the denial of their motion for severance. McAnderson also contends that the in-court identification of a member of the El Rukns was prejudicial. For the reasons discussed in this opinion, we reject each of the defendants' challenges and affirm their convictions.

## I. BACKGROUND

The El Rukns are a Chicago street gang with slightly over 100 members. The gang began in the 1960's as the Blackstone Rangers. In the 1970's, they were known as the Black P Stone Nation. In the 1980's, Jeff Fort became the undisputed leader of the gang and the organization was renamed the El Rukns, meaning "cornerstone." The El Rukns, under Fort, became a carefully structured enterprise. Fort, the "Imam", sat at the top of the hierarchy. Beneath him in descending rank were "generals," "Officer Muftis," "ambassadors," and "soldiers" or "Els." Under Fort's leadership, the El Rukns also embraced certain elements of the Black Muslim faith. Their headquarters at 3947 South Drexel was known as the "Mosque," and occasional religious services, educational classes and social gatherings were held there.

In 1984, Jeff Fort began serving a lengthy sentence at the Federal Correctional Institute in Bastrop, Texas.[1] Despite this incarceration, Fort remained the leader and mastermind of the El Rukns. Fort maintained his control over the organization via extensive telephone conversations from Bastrop to the Chicago Headquarters. In order to frustrate federal authorities who were monitoring and recording these conversations, Fort and his chief "general," Melvin Mayes, developed a complex code for use during these conversations.

While in prison in Bastrop, Fort learned that Louis Farrakhan had received $5 million from the Libyan government. Fort determined that at those wages, the El Rukns should become employees of the Libyans as well. Fort decided to offer the services of the El Rukns to the Libyans. According to Fort's plan, the El Rukns would offer to perform terrorist activities within the United States in return for $1 million a year from the Libyan government. On March 11, 1986, El Rukn members Leon McAnderson and Reico Cranshaw, along with Charles Knox (an unindicted co-conspirator), travelled to Libya to meet with military officials of the Libyan government. At these meetings, Cranshaw and McAnderson presented the El Rukns' offer. Fort was informed of this meeting and began planning a way to impress the Libyans and to demonstrate the depth of the El Rukns' commitment to the enterprise. In various conversations, Fort, McAnderson, Cranshaw and others discussed destroying a government building, planting a bomb, blowing up an airplane, killing a Milwaukee alderman, or simply committing "a killing here and a killing there" to get the Libyans' attention. Ultimately, Fort decided that it would be more simple to take credit for other people's acts of violence. Thus, a clipping file was established to keep track of particularly violent, but as yet unsolved, crimes throughout the United States. The El Rukns would then send this file to the Libyans and take credit for the mayhem. Fort considered this effort to be "lightweight," and therefore also decided to make a videotape of El Rukns pretending to be from various cities around the country to impress the Libyans with the breadth of the El Rukns' membership.

The hostilities in the Gulf of Sidra between the United States military and Libyan air forces forced McAnderson, Cranshaw and Charles Knox to cancel a planned return trip to Libya in May of 1986. At Fort's instruction, the three flew instead to

---

1. Fort's conviction was unrelated to the current charges. The record therefore does not indicate the crime(s) for which he was sentenced.

Panama to meet with Libyan officials at the Libyan mission there. In Panama, they gave the Libyans the videotape made under Fort's orders. Upon their return, customs agents searched McAnderson and Cranshaw's luggage and discovered a document written by Cranshaw vaguely describing various acts of terrorism to be performed for the Libyans.

Near the end of June 1986, Fort decided that the Libyans would only be impressed by the use of powerful explosives. He told Cranshaw and McAnderson to discuss with the Libyans the possibility of providing explosive training for the El Rukns. The true focus of Fort's plan, however, was obtaining a handheld rocket launcher or "LAW" rocket. The LAW rocket (for "light anti-tank weapon") was designed to destroy armored tanks. The blast of the explosive and the intense heat can melt ten to twelve inches of armor plate and can penetrate concrete bunker-type facilities. The plan to purchase this deadly weapon, however, was intercepted by the Federal Bureau of Investigation (FBI).

Ultimately, the FBI, through Special Agent Willie T. Holan and Sam Buford, an informant, contacted Alan Knox, a member of the El Rukns, and offered to sell him several LAW rockets and other military supplies. Holan had been in the process of setting up Knox for a cocaine sting, but successfully shifted gears and convinced Knox that he was also able to provide high-tech military weapons such as the LAW rocket. The weapon which Holan ultimately provided was inoperative, but appeared to contain a "live" explosive. On July 31, 1986, Knox, under instructions from Fort and Mayes, purchased the rocket for $1800. Knox, Mayes and Roosevelt Hawkins, another member of the El Rukns, met with Buford on that day and exchanged the money for the rocket. Hawkins drove and waited outside with the money while the final terms of the deal were completed. Once the purchase was made, Hawkins then drove the rocket home toward the "Hut," a building owned by the

El Rukns at 6414–6416 South Kenwood in Chicago, but experienced car trouble and turned the rocket over to Mayes who transported it the rest of the way.

On August 5, a search of the "Hut" was conducted pursuant to a warrant. The search uncovered the LAW rocket, as well as 32 firearms, including a MAC–10 machine gun, a fully-automatic .45–caliber pistol, and a .45–caliber Commando volunteer carbine, along with several rounds of armor-piercing bullets designed for submachine gun use.

Fort, McAnderson, Cranshaw, Knox and Hawkins were subsequently charged in a 50 count indictment in the Northern District of Illinois for their roles in the conspiracy. The central count was conspiracy to commit terrorist acts in violation of 18 U.S.C. § 371.[2] Other counts charged the defendants with interstate travel and use of the telephone in furtherance of the conspiracy. Still other charges involved the firearms and the explosives. All the defendants save Hawkins were named in all 50 counts of the indictment. Hawkins was named only in counts 1 and 41–45.

A trial began before Judge Charles R. Norgle on October 7, 1987. On November 24, 1987, the jury returned guilty verdicts against all five defendants. Jeff Fort, still serving time on his original sentence, was given an additional 80 years in prison. Leon McAnderson received 51 years; Alan Knox, 54 years; Reico Cranshaw, 63 years; and Roosevelt Hawkins, who was convicted on only 4 counts, 9 years. Following sentencing, each of the defendants filed a timely notice of appeal. The five defendants presented a consolidated brief on appeal. In addition, McAnderson and Hawkins each presented a supplemental brief presenting separate challenges to their conviction.

## II. THE JURY

The sixth amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public

---

**2.** Two others, Melvin Mayes and Trammel Davis, were also named in the indictment. Davis pled guilty and provided government testimony. Mayes is a fugitive and remains at large.

trial, by an impartial jury[.]" U.S. Const. amend. VI. The defendants contend that various errors in the selection and instruction of their jury denied them this fundamental right of impartiality. Specifically, they argue that neither the jury venire nor the petit jury represented a fair cross-section of the community. Defendants also contend that the government improperly used its peremptory challenges to strike black venire members from the jury; that the district court did not adequately question the jurors about potential racial or religious prejudice; and that the jury was tainted due to fears for their safety—fears that they allege were not properly addressed by the district court. We will address each of these challenges in turn.

## A. The "Fair Cross–Section" Requirement

■ Under *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), a defendant who challenges the composition of the jury venire must demonstrate three separate elements in order to establish a *prima facie* violation of the fair cross-section requirement. The defendant must demonstrate:

> (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 99 S.Ct. at 668. *See also Humphrey v. United States*, 896 F.2d 1066, 1069 (7th Cir.1990). Eight of the 65 venire members were black. Thus roughly 12 percent of the pool of potential jurors belonged to that group in the community. Defendants contend that the Northern District of Illinois counts 20 percent of its population as African–American; eight percentage points higher than the venire. We have never held that such a *de minimis* disparity amounts to an unfair or unreasonable representation of any "distinctive group." As the Supreme Court has noted, discrepancies of less than ten percent, standing alone, cannot support a claim of

underrepresentation. *See Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Defendants, therefore, have not established the second element of the *Duren* standard.

■ Even had the defendants survived this hurdle, however, they have not alleged any pattern of systematic exclusion of potential jurors from the venire as required by the third element of *Duren*. Without a demonstration of such exclusion, a challenge to the venire cannot stand. *See Davis v. Warden*, 867 F.2d 1003, 1014 (7th Cir.1989). We therefore reject defendants' contention that their venire did not represent a fair cross-section of the community.

■ Defendants also argue that blacks were underrepresented in the petit jury. The Supreme Court has recently stated, however, that a defendant has no sixth amendment right to a petit jury representing a fair cross-section of the community. *Holland v. Illinois*, —— U.S. ——, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). In *Holland*, a white defendant challenged the prosecution's use of his peremptory challenges to remove all black jurors from the petit jury. The Court noted that while *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), prohibited exclusion of jurors on racial grounds under the fourteenth amendment, this principle did not extend to the sixth amendment guarantee of an impartial jury. As the Court stated:

> A prohibition upon the exclusion of cognizable groups through peremptory challenges has no conceivable basis in the text of the Sixth Amendment, is without support in our prior decisions, and would undermine rather than further the constitutional guarantee of an impartial jury.... The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury, (which the Constitution does not demand), but an *impartial* one (which it does).

*Id.*, 110 S.Ct. at 806–07 (emphasis in original). Given this strong directive by the Supreme Court, there is no question that

defendants' challenge to the composition of the petit jury cannot succeed. Further, the defendants' attack on the composition of the petit jury would fail regardless of *Holland.* Two blacks were chosen to sit on the jury. Although one of these jurors was later removed for reasons wholly unrelated to race, the defendants' jury was fairly representative of the community. In sum, the defendants' charge that blacks were underrepresented on the petit jury is wholly without merit.

## B. The Prosecution's Use of Peremptory Challenges

▮ Under *Batson v. Kentucky,* the government is forbidden from using its peremptory challenges to remove members of the venire based on race or on the assumption that black jurors will be unable to consider the case against a black defendant impartially. 476 U.S. at 89, 106 S.Ct. at 1719. *See also United States v. Briscoe,* 896 F.2d 1476, 1486 (7th Cir.1990). A defendant who is a member of a cognizable racial group "may make out a *prima facie* case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson,* 476 U.S. at 93–94, 106 S.Ct. at 1721. Thus, under this standard, a plaintiff could make out a *prima facie* case "solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96, 106 S.Ct. at 1723. No ongoing pattern of discrimination need be shown.

▮ In this case, there were eight black members of the venire. Four were dismissed for cause. Of the remaining four black members, the government accepted two of them, Mayme George and June Anderson, before exercising a single peremptory challenge. Significantly, Anderson was accepted by the government after it attempted to challenge her for cause due to doubts about her physical ability to see and hear evidence at trial. Thus, the prosecution could have forwarded a race-neutral justification for exercising a peremptory challenge, but did not do so. The government did strike two other black members only after providing the

district court with racially neutral reasons for the use of the peremptory challenges. (One challenge was based on the prospective juror's fear of the El Rukns; the other on the fact that the prospective juror lived in an area near the El Rukns' headquarters and thus could have been intimidated by other gang members.) These challenges accounted for one-quarter of the government's challenges—six white venire members were also stricken by the government. Further, these challenges affected only one-quarter of the black members of the venire. Viewing the totality of the relevant facts, as we must under *Batson,* we conclude that defendants have not established a *prima facie* case of discriminatory purpose in the government's use of peremptory challenges.

## C. Racial and Religious Bias Among the Petit Jurors

Defendants contend that because this trial involved the El Rukns, a notorious, predominantly black Chicago street gang, and due to the discussion of the defendants' Black Muslim faith, the district court should have asked particularly pointed questions of potential jurors during the *voir dire.* The court's failure to do so, they argue, amounted to prejudicial error.

▮ It is axiomatic that the purpose of *voir dire* is to ensure the defendant an impartial jury. *Rosales–Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). The district court must, therefore, make inquiry that is sufficient to allow *voir dire* to perform its "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence...." *Id.* at 188, 101 S.Ct. at 1634. An adequate *voir dire* must also provide the defendant the information necessary to exercise his right to peremptory challenges. *Id. See also United States v. Robinson,* 832 F.2d 366 (7th Cir.1987). A judge has broad discretion in determining what questions may be asked during the *voir dire. See United States v. Sababu,* 891 F.2d 1308, 1325 (7th Cir.1989). As this court has stated:

This court will not find that a trial court abused its discretion in conducting *voir dire* where there is sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge.

*United States v. Hasting,* 739 F.2d 1269, 1273 (7th Cir.1984).

Here, the district court adequately questioned potential jurors about possible prejudice. The court asked such direct questions as "Will your decision in this case in any way be based upon the race, religion or the ethnic background of the defendant?" In addition, the court asked questions about the venire member's knowledge about the El Rukns. The *voir dire* was detailed and lengthy. Defense counsel had adequate information on which to exercise knowledgeably their peremptory challenges. The district court did not abuse its discretion in probing for racial and religious bias. Defense counsel suggests two additional questions which the court might have used to elicit possible racial and religious prejudice among the potential jurors. We will not reverse a careful and detailed *voir dire* process merely because the court did not ask certain questions thought by the defense to be "better" than the ones used. *See United State v. Price,* 888 F.2d 1206, 1209–12 (7th Cir.1989).

Moreover, the defendants' suggestions were not even helpful. The defendants wanted the court to ask questions regarding prejudice due to the evidence of the Black Muslim faith. As the prosecution points out, the description of the El Rukns as a religious organization was the subject of much debate at trial and the cornerstone of the defense's theory of the case. The court could therefore refuse to ask questions which assumed the presence of the religious element in the case. *Cf. Price,* 888 F.2d at 1209–11. The district court was well within its discretion in refusing these suggested questions.

D. Possible Taint Due to the Jurors' Concern for Safety

During the course of the trial, eight jurors signed a note sent to Judge Norgle requesting additional information about the procedures to be followed during the trial. Question four on this list states: "Many of us use public transportation and walk 4–6 blocks from here to the depot. Due to the severe accusations and due to the fact that it will be getting dark earlier, is it possible to have someone take us to the depot at night?" In response to this note from the jury, Judge Norgle instructed the jurors that all necessary instructions would be given at the end of the trial and that "there is no basis for me now to instruct you on any of the issues that you have brought to my attention."

Defendants, without providing any authority from this circuit or elsewhere, contend that the court should have responded directly to this one question. We disagree. The note itself does not indicate that the jury could not consider the issues before it impartially. Indeed, the question on which defendants base their objection is fourth on the list following questions about sequestration and other procedural matters. This hardly indicates a jury preoccupied with terror. As the government points out, the questions discuss "accusations" rather than "crimes" or "acts," indicating that the jurors were aware of their role as fact-finder and were careful not to prejudge the charges to be presented to them. In short, this note does not in any way demonstrate that the defendants' jury was less than fair and impartial.

Defendants also raise a second challenge based on the removal of certain members of the jury. On October 20, 1987, four jurors informed the court that they had received threatening telephone calls. A fifth juror explained that she had heard about these threatening calls from another juror. The court dismissed each of the five jurors. The remaining jurors were then sequestered for the duration of the trial. Judge Norgle also instructed the remaining jurors that this dismissal should not be considered the fault of either the govern-

944

ment or the defense and that no speculation should be made about the reasons for the dismissal. No further instruction or questioning was conducted by the court. The defendants assert that the court erroneously removed the five jurors and compounded this error by failing to question the remaining jurors about possible fear or bias. We strongly disagree.

▇▇▇▇▇ The district court has broad discretion to remedy prejudicial influences upon the jury. *See United States v. Williams*, 737 F.2d 594, 613 (7th Cir.1984); *United States v. Verkuilen*, 690 F.2d 648, 658 (7th Cir.1982). Among the discretionary powers is the authority to replace jurors with alternates where circumstances so demand. *See United States v. Shelton*, 669 F.2d 446, 460 (7th Cir.1982). Here, the jurors who had received telephone calls regarding the case were determined to be genuinely fearful by the district court. Given this level of fear, the jurors were properly removed. In *Williams*, the court allowed jurors who had received phone calls to remain on the jury after determining that the calls were pranks. No taint or fear existed. 737 F.2d at 611–13. Although the defendants rely heavily on this case, it is clearly inapposite. The calls to the jurors in this case were not pranks, but threatening to the jurors and their families. The district court acted quickly and properly by removing these jurors from the case and by so doing eliminating the possibility of bias to the rest of the jury. This cannot under any circumstances be labelled an abuse of discretion.

▇▇▇▇▇ Once the jurors were removed, however, the court faced another dilemma: what instruction should be given to the remaining jurors? In *United States v. Shapiro*, 669 F.2d 593 (9th Cir.1982), the Ninth Circuit stated that the district court's discussion of the removal of a juror with the remaining jurors may taint those ju-

rors. On the other hand, ignoring the dismissal of five jurors could also be considered prejudicial error. We believe the court exercised its discretion carefully by instructing the jury simply and directly that no adverse inference should be drawn for either side, and delving no further into limiting instructions. Any discussion of the fear which caused the removal of the jurors risked conjuring up in the remaining jurors some element of that fear. The process of instructing the jury on any matter, particularly instructions regarding bias and prejudice, must be left to the discretion of the person most closely familiar with the circumstances surrounding the trial: the trial judge. The instruction here cannot be considered an abuse of that considerable discretion.

### III. EVIDENCE OF OTHER BAD ACTS

The defendants contend that the district court erred by allowing evidence of cocaine, marijuana and other drug transactions to be presented to the jury.[3] This prejudiced their trial in two fundamental ways, according to their argument. First, the drug testimony constructively amended their indictment to include uncharged offenses. Second, the evidence was inadmissible under Fed.R.Evid. 404(b) as the use of prior bad acts to show action in conformity with those acts.

▇▇▇▇▇ An indictment may be considered constructively amended where evidence presented at trial broadens the possible bases for conviction by proving an offense not fully contained in the original indictment. *See United States v. Rosin*, 892 F.2d 649, 651 (7th Cir.1990). Such amendments are considered prejudicial *per se* because they deny the defendant his right to a grand jury and hamper the ability to prepare adequately for trial. *Id.* at

**3.** The defendants' actually challenge dozens of various statements regarding references to prostitution, gambling, illegal passport applications, the history of the El Rukns and other matters. We will not go into each of these challenges. The drug transactions are the cornerstone of their argument and we will analyze these for

purposes of Fed.R.Evid. 404(b). The other statements were similarly offered to either rebut the statements made by defense counsel in opening argument or to describe the actions surrounding the events for which the defendants were on trial.

651 n. 2. *See also United States v. Field,* 875 F.2d 130, 133 (7th Cir.1989). We have stated that constructive amendment of the indictment may occur "[w]here a complex set of facts is presented to the jury ... which is distinctly different from the set of facts set forth in the charging instruments, [or] where the crime charged in the indictment [is] 'materially different or substantially altered at trial[.]' " *United States v. McNeese,* 901 F.2d 585, 603 (7th Cir.1990) (quoting *United States v. Kuna,* 760 F.2d 813, 818 (7th Cir.1985)).

■ Here, we do not believe that the indictment was constructively amended. The prosecution used evidence of the drug transactions to rebut defense theories and impeach statements of the witnesses. In his opening statement, counsel for Jeff Fort stated: "the El Rukns ... are a group of people who banded together for brotherhood, discipline in their lives, lives that were often chaotic, to put God in their lives." At another point, Fort's counsel stated that some members of the El Rukns "have been in trouble in the past. Some are still in trouble. But that's no different than any other organization whether it be lawyers, a group of Catholics, or Jews, or Protestants or Muslims; it's no different than any other organization. I venture to say even the Knights of Columbus have a few people in trouble every now and again." Counsel for the other defendants echoed these assertions in their opening statements. Thus, the prosecution was entitled to rebut this characterization of the El Rukns before the jury. No reading of the record can support the defense's assertion that the discussion of drug transactions amounted to a trial on these questions. The indictment concerned terrorism, weapons and conspiracy. The government presented its case on these charges and the defendants were found guilty. The evidence of drug transactions could not have led the jury into the improper belief that somehow these defendants were being charged with narcotic offenses. No possibility of such confusion existed and no constructive amendment occurred.

■ The admission of these statements could still be error, however, if the evidence of prior bad acts was offered to prove actions in conformity therewith in violation of Fed.R.Evid. 404(b).[4] That rule provides, however, that evidence of other bad acts may be admissible as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). This circuit has established a four-part test to determine the admissibility of evidence for purposes of Rule 404(b). *See United States v. Penson,* 896 F.2d 1087, 1091 (7th Cir.1990); *United States v. Schackleford,* 738 F.2d 776, 779 (7th Cir.1984). Under this test, prior bad acts may be admitted where:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Penson,* 896 F.2d at 1091 (footnote omitted). *See also United States v. Briscoe,* 896 F.2d 1476, 1499 (7th Cir.1990). The decision whether to admit any particular piece of evidence is within the broad discretion of the trial judge. *See Penson,* 896 F.2d at 1092. Upon review, we will overturn the district court's decision only for an abuse of that discretion. *Id.*

---

**4.** Some of the statements objected to by the defendants involved the drug transactions between Agent Hulon, Sam Buford and Alan Knox. Hulon was conducting an undercover narcotics investigation involving the sale of cocaine to Knox when Knox inquired about the possibility of acquiring a LAW rocket. Thus, the evidence of this cocaine transaction was part of the case-in-chief and was necessary to demonstrate Hulon's familiarity with Knox, his reason for contacting him and his credibility in remembering Knox's statements and actions. This therefore did not constitute prior bad act evidence under Fed.R.Evid. 404(b), but was part of the evidence concerning the events for which Knox and the other defendants were charged.

▉ The admission of the evidence of drug activity in this case satisfies our four-part test. The evidence was not offered to demonstrate the defendants' tendency to commit acts of terrorism or to stash illegal firearms. Instead, the prosecution submitted this evidence to rebut the statements made by the defense in opening argument, and pursued throughout trial, that the El Rukns were a social and religious organization similar to many Catholic, Jewish, Protestant and Muslim groups. Counsel for Jeff Fort compared the El Rukns to the Knights of Columbus. The door was effectively opened for a great deal of rebuttal evidence after this line of defense was established. Moreover, these alleged prior bad acts involved organized efforts to import and sell illegal drugs to enrich the El Rukn membership, and thus are directly similar to the charges of conspiracy contained in the indictment. They are also closely related in time. Many of the drug transaction discussions occurred at the same time as the Libyan conspiracy conversations. Beyond this, given the overwhelming amount of cocaine and narcotics discussions in the recorded telephone conversations between Fort and the other defendants, it is clear a jury finding on these other acts would have been supported by the evidence.[5] Finally, the probative value of the evidence is not substantially outweighed by the danger of prejudice to the defendants. Fed.R.Evid. 403. The evidence of drug transactions and use went to the heart of defendants' contention that the El Rukns were a fundamentally religious organization and sought money from Libya to refurbish their "Mosque." The jury was informed, not incited, by these references. The district court, therefore, did not abuse its discretion in by admitting evidence of the defendants' prior involvement with cocaine, marijuana and other illegal drugs.

## IV. THE MOTION FOR A BILL OF PARTICULARS

▉ Defendants also contend that the court erred by refusing to grant their motion for a bill of particulars. We will reverse a trial court's decision to deny a such a motion "[o]nly when the trial court clearly abuses its discretion[.]" *United States v. Andrus*, 775 F.2d 825, 843 (7th Cir.1985). Beyond this, we will recognize such an abuse only where the defendant suffers actual prejudice from the denial. *Id. See also United States v. Johnson*, 504 F.2d 622, 627 (7th Cir.1974). We have consistently held that where the indictment provides sufficient information to inform the defendant of the nature of the charges against him, and the government provides the defendant with information about the alleged overt acts and co-conspirators prior to trial, the defendant has not suffered prejudice from the refusal of the request for a bill of particulars. *Andrus*, 775 F.2d at 843. *See also United States v. Kendall*, 665 F.2d 126, 134–35 (7th Cir.1981).

▉ Here, the indictment withstands such scrutiny. The second superceding indictment upon which the defendants were charged contained carefully detailed charges. The dates and times of various telephone calls were listed. The name of each co-conspirator was provided. Specific threatened acts of violence underlying the conspiracy were enumerated. The dates of travel to Libya and Panama to meet with Libyan officials were specifically listed. In short, defendants were well-prepared by this indictment to face the charges against them. In *Andrus*, we held that by listing the dates that the defendant travelled to

---

**5.** Defendant McAnderson, in a supplemental brief, contends that references to his drug involvement were improper because of his limited involvement with these activities and that such references caused the jury wrongly to view him as a drug user. His contentions, like those of his co-defendants, must fail. McAnderson's counsel argued in the opening statement that his client "has never involved himself in any narcotics types of transactions." Further, McAnderson's stated reason for joining the El Rukns was his desire to help black people. Evidence of his drug use and involvement with drugs was therefore directly relevant to the prosecution's rebuttal of this theory. It was not admitted to prove action in conformity with the charges at trial. The admission of this evidence under Fed.R.Evid. 404(b) was not an abuse of the district court's discretion.

specific cities to acquire drugs and by listing the dates of the allegedly incriminating phone calls to be presented by the government, the indictment against the defendant was valid and his motion for a bill of particulars was properly denied. 775 F.2d at 843–44. Defendants here were similarly not prejudiced by the denial of their motion. The district court was well within its discretion in refusing to require a bill of particulars.

Defendants also contend that they were prejudiced by the government's failure to provide a bill of particulars regarding the extensive use of prior bad acts against them at trial. They contend further that they should have been provided earlier access to the decoded transcripts of the telephone conversations. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), provides that the "suppression by the prosecution of evidence favorable to the accused upon request violates due process." *Id.* at 87, 83 S.Ct. at 1196–97. The defendants argue that the government's refusal to provide this information hampered their preparation for trial and thus violated their due process rights.

 As we have stated, *"Brady* does not grant criminal defendants unfettered access to government files." *United States v. Phillips,* 854 F.2d 273, 277 (7th Cir.1988); *Andrus,* 775 F.2d at 843. The district court must exercise its discretion in determining what evidence is material for purposes of *Brady. Phillips,* 854 F.2d at 277. In the instant case, defendants' contentions must fail, because the record demonstrates that the government did provide the defendants with a decoded transcript prior to trial.[6] Moreover, the government revealed to the defendants before trial that certain prior bad acts would be offered against them. Other bad act testimony became relevant once the defense presented its theory of defense in the opening

statements. The government could not have absolutely predicted the use of this evidence (although admittedly it was quite likely that any defense theory would have opened the door to such evidence used at trial). Therefore, this evidence need not have been released pre-trial. The government clearly met its burden of providing information necessary for the preparation of the defendant's case. The denial of further discovery was not an abuse of discretion.

## V. CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE

In their supplemental briefs, defendants McAnderson and Hawkins contend that there was insufficient evidence to support certain aspects of their convictions. McAnderson alleges that his possession of two firearms was not proven beyond a reasonable doubt. Hawkins submits that insufficient evidence existed to demonstrate his knowing participation in the overall conspiracy.

When reviewing a challenge to the sufficiency of the evidence, we will uphold the jury's determination if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1979) (emphasis in original). As we have stated, "[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *McNeese,* 901 F.2d at 600. Neither McAnderson nor Hawkins can overcome this heavy burden.

 Possession of a firearm may be either actual or constructive. As this court has stated, "[c]onstructive possession exists when a person does not have actual

---

6. We also reject defendant McAnderson's challenge to the use of these transcripts at trial. We have often held that a written transcript may be used to aid the jury in listening to tape recordings. *See United States v. Zambrana,* 841 F.2d 1320, 1335 (7th Cir.1988) (spanish language translations); *United States v. Keck,* 773 F.2d

759, 766 (7th Cir.1985) (transcribed tape recordings). The jury was properly instructed that these transcripts were not evidence but merely meant to assist in evaluating the tapes which were the actual evidence. These procedures were proper and free from error.

possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Garrett*, 903 F.2d 1105, 1110 (7th Cir.1990) (construing 18 U.S.C. § 922(g), possession of a firearm by a convicted felon). *See also United States v. Taylor*, 728 F.2d 864, 868 (7th Cir.1984). Here, the evidence demonstrates McAnderson's constructive possession of both the .45–caliber pistol and the 9mm machine gun. McAnderson was one of the El Rukns "generals," the highest rank under Fort. His taped conversations with Fort indicate that he participated in discussions about murders and other violent acts to impress the Libyans. He was closely familiar with the violent nature of the plan and was one of the central figures who travelled to Libya and Panama to participate in discussions with the Libyan government. The jury could reasonably conclude that he was aware of the violence that had been planned and knew that the weapons in the El Rukns' possession would be used to commit these acts.

McAnderson contends that his fingerprints were not on the weapons, nor did the government demonstrate that he had any access to the weapons. Such evidence is not necessary to prove his constructive possession of the weapons. Circumstantial evidence alone, if strong enough, will support a conviction for constructive possession. *See Garrett*, 903 F.2d at 1110. We have stated, "It is not necessary that such evidence remove every reasonable hypothesis except that of guilt." *Id.* Here, viewing the evidence in the light most favorable to the government, as we must, there is sufficient evidence to support McAnderson's convictions for possession of the firearms.

Similarly, there was sufficient evidence to find that Hawkins knowingly participated in the conspiracy. This court has noted, "The parties involved in a conspiracy do not have to know the other conspirators or participate in every aspect of the conspiracy. As long as they knowingly embraced the same criminal objectives, they

participated in a single conspiracy." *McNeese*, 901 F.2d at 600 (citation omitted). The evidence demonstrates that Hawkins played a fundamental role in the acquisition of the LAW rocket, the centerpiece of the conspiracy. Hawkins drove to the site of the purchase; he held the buy money; the rocket was placed in Hawkins' car; and Hawkins delivered the rocket to Mayes. A rational trier of fact could easily conclude from these facts that Hawkins had embraced the conspiracy and had taken action in furtherance of the conspiracy's objectives. There was substantial evidence to support his conviction.

## VI. MOTIONS FOR SEVERANCE

McAnderson and Hawkins also contend that the court committed reversible error in denying their motions for severance. We will overturn the district court's determination on a motion to sever only for an abuse of discretion. *See Penson*, 896 F.2d at 1094. *See also United States v. Walters*, 913 F.2d 388, 392 (7th Cir.1990). In order to appeal successfully a motion for severance, a defendant must demonstrate actual prejudice resulting from the denial. *See Walters*, at 392; *Briscoe*, 896 F.2d at 1516. This prejudice must be of such a nature that the defendant could not have been afforded a fair trial without severance, "not merely that a separate trial would offer him a better chance of acquittal." *Briscoe*, 896 F.2d at 1516.

McAnderson contends that his defense was antagonistic to his co-defendants and therefore severance was required. As support for this, he states that because of Fort's opening statement, prior bad acts evidence was admitted against him. Further, he argues that his attempt to play a portion of a tape at closing argument—a passage he believed contained his own exculpatory statements—was denied because of objections from his co-defendants. Neither of these shortfalls, he believes, would have occurred in an individual trial. We disagree.

As we noted above, the prior bad acts of McAnderson were admissible under Fed.R.Evid. 404(b) not merely because of the statements by counsel for Fort, but because of McAnderson's own opening statement and theory of defense. McAnderson's argument that he joined the El Rukns to help black people and that the El Rukns prohibited contact with drugs among their members opened the door for a wide range of bad acts evidence. This would have come in against McAnderson at either a joint or individual trial. Further, McAnderson's attempt to play the tape at closing argument was refused in part because he had not introduced this tape into evidence earlier. McAnderson was the only defendant to take the stand in his own defense. He could have chosen to play the tape and comment on it at that time. He did not. McAnderson cannot now contend that he deserves a separate trial because of this tactical decision.

Beyond these questions of prejudice, however, we have held that severance due to "mutually antagonistic defenses" is required only where "the defenses are irreconcilable and so antagonistic that 'the acceptance of one party's defense will preclude the acquittal of the other.'" *Briscoe*, 896 F.2d at 1518 (quoting *United States v. Hendrix*, 752 F.2d 1226, 1232 (7th Cir.1985)). *See also Walters*, at 392. McAnderson has not demonstrated such irreconcilable differences with his co-defendants. His defense, like theirs, asserted that the El Rukns were victims of a misperception. He contended, as did his co-defendants, that the scheme was merely to defraud the Libyans out of funds to rebuild the "Mosque." This is not antagonistic. The decision to deny his motion for severance was not an abuse of the trial court's discretion.

Hawkins also contends that the evidence against his co-defendants was so overwhelming that the jury could not evaluate his claim independently and fairly. Admittedly, Hawkins was the smallest player in this drama. We have recognized that there is a danger in complex cases that the taint of the larger actors might spill over onto the smaller ones. *See Briscoe*, 896 F.2d at 1516. There is also, however, an important benefit to joint trials. Our system of criminal justice would crumple beneath the weight of individual trials if every defendant who demanded severance was provided one. Instead, we ask the district court to evaluate the risk to the defendant against the benefit to the system. *See Walters*, 393. Here, the trial court exercised its sound discretion and determined that justice would not be served by separate trials. Hawkins understandably objects, but he has not articulated specifically how he has been tarred by the wide brush of a multiple trial. The district court instructed the jury to consider the guilt or innocence of each defendant independently. We must assume that such instructions are followed by the jury. *See United States v. Montoya*, 891 F.2d 1273 (7th Cir.1989). Given the jurors' lengthy six-day deliberation, this instruction appears to have been carefully heeded. The denial of Hawkins' motion for severance was, therefore, not an abuse of discretion.

## VII. THE IDENTIFICATION OF AL AMIN

Finally, McAnderson alone contends that the in-court identification of a member of the El Rukns, Al Amin, was unfairly prejudicial, and that therefore the district court should have granted his motion for mistrial. We disagree. During his direct examination by the government, Tramell Davis testified that Melvin Mayes had discussed the possibility of working with a man, Al Amin, who was knowledgeable about explosives. Davis later saw this man doing electrical work at the El Rukn headquarters. On October 29, 1987, Al Amin was an unexpected spectator in Judge Norgle's courtroom during Tramell Davis' testimony for the government. When Davis recognized Amin he tried to describe Al Amin from the witness stand, but had difficulty due to his eye problems. Davis left the stand to identify Amin while standing next to him. When he did Davis was accompanied by at least one federal marshal. McAnderson contends that the marshall ap-

peared to be protecting Davis from the defendants and that this spectacle was highly prejudicial and demands a declaration of mistrial.

Initially, we note that Davis was in federal custody at the time of his testimony. It was not unusual therefore for a federal marshal to accompany him everywhere. He was not being protected from the defendants any more than the defendants were being protected from him. Further, we note that we will overturn a decision on a motion for mistrial only for an abuse of discretion. *United States v. Perez*, 870 F.2d 1222 (7th Cir.1989). Here, Judge Norgle determined that given the complicated nature and length of this trial, the momentary actions of a federal marshal did not unfairly prejudice the jurors. Our review of the facts as presented here leads us to the same conclusion. No prejudice can be read from the record whatsoever. The district court acted within its discretion in denying McAnderson's motion for a mistrial.

## VIII. CONCLUSION

For the foregoing reasons the defendants' convictions are

AFFIRMED.