CRAWFORD, Judge
(concurring in part, dissenting in part, and concurring in the result):
The majority overlooks the fundamental nature of our adversary system and precedent from this Court and the Supreme Court, and gives little advice to the bench and bar that is helpful. I agree with the result but dissent from part of the rationale.
It is important to separate what was proper prosecution argument from what was improper. Based on the opening statements and examination of the witnesses, the prosecution could legitimately rebut the defense argument that Appellant’s statement was coerced by arguing the background facts surrounding the rights warnings statements, Appellant’s termination of the interrogation, and his voluntary return to the police to give a statement. However, it would be improper to argue that a “truly innocent” individual would see a lawyer, whereas a guilty person “has an incentive to come back and try to minimize things.” The first approach is permissible. The latter is impermissible.
The first comment and its expansion when placed in context is clearly reasonable. The best evidence any counsel can have is the statement of the party opponent, in this case, Appellant’s confession. The defense counsel recognized that and sought to discount its impact by using the small window of urinalysis testing. When the defense seeks to use the Fifth Amendment, Article 31, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 831 (2000), and the Military Rules of Evidence as a sword, the prosecution has an absolute right to respond with fair rebuttal.
The prosecutor’s statement placed in context constitutes fair rebuttal to the defense theory of the case which began with defense counsel’s opening statement:
You’re also going to hear from — Mr. Haney, incidentally, is going to testify. So at least you’ll know that. That is the defendant. The reason is you’re going to hear evidence from him as to the promises being made and the fact that, if you say a couple of things, don’t worry about it, everything will go away. You’re going to hear that he went to see the investigating officer twice; the first time he walked out because of these alleged promises, and then he came back because there was a promise that if he did not state his involvement he would be tossed in the brig, but if he did make a statement as to anything that was talked about here, don’t worry about it, nothing is going to happen. So that’s the issue regarding Sergeant Deal who handled the investigation. And, again, you’re going to hear all • of this.
PROSECUTION CASE
Private Crist D. Pugh testified that he had seen Appellant use marijuana over a dozen of times. This happened in Covington, Kentucky, on a weekend, July 28, 1995, through July 30,1995. Wfiien they arrived in Covington, they met Appellant’s girlfriend, Lance Corporal Melissa D. Sandlin, at a hotel room with five or six people and smoked seven or eight “joints” of marijuana that Appellant brought. Between August 18, 1995, and the August 20, 1995, they again drove to Covington and met Appellant’s friend, Paul, and Appellant’s girlfriend. This time they shared one joint. Pugh and Appellant went to Covington again on the weekend of October 20, 1995, through October 22, 1995. They were accompanied by Lance Corporal Brumley and Lance Corporal Winters on the trip. They stayed at the same hotel and used marijuana on various occasions. At the hotel, they were met by Lance Corporal Sandlin and purchased marijuana from Sandlin’s uncle.
*110 On February 2, 1996, through February 4, 1996, Pugh and Appellant went back to Covington, Kentucky, with Brumley. This time they met with Paul and another friend, Tim, Appellant’s girlfriend, and another female. They smoked marijuana on various occasions. During the weekend of May 17, 1996, through May 19, 1996, Pugh, Appellant, and Appellant’s girlfriend went on a camping trip to Aquia Landing Campground, where they used marijuana. During the months of February 1996 and March 1996, they went to Stafford, Virginia, where they smoked marijuana.
A camping trip in May 1966 involved Appellant, Brumley, Lance Corporal Williams, Private First Class Crouse, Lance Corporal Smith, Lance Corporal Plummer, Pugh, and another private first class. Plummer brought the marijuana along, and it was smoked by Pugh, Appellant, Plummer, and Brumley.
Private Brian T. Grimm also testified on behalf of the Government. He corroborated Pugh’s testimony that the group, including Appellant, went to Covington, Kentucky, in April 1995, where they partied, drank, and smoked marijuana. This testimony was cut short because the military judge would not allow the Government to refresh his memory about his statement he made to the Criminal Investigation Command (CID) on June 20, 1996. Private Grimm then testified about the statement.
DEFENSE CASE
To counter the Government’s case, the defense counsel used a multiple approach to defend against the charges in this case. First, the defense presented evidence of a negative urinalysis sample which was taken close in time to one of the supposed “marijuana” smoking events. Second, the defense presented several friends and acquaintances of Appellant and his girlfriend to testify they never observed Appellant consuming marijuana. Third, in an attempt to negate Appellant’s admissions to law enforcement officials, the defense attempted to demonstrate that Appellant’s statements were coerced and thus, unreliable.
The defense introduced Defense Exhibit B, which was a urinalysis sample taken on May 29, 1996, showing a negative result. A positive result for marijuana in urine is dependent on when the consumption occurred in relation to rendering the sample and the amount of consumption. A negative urinalysis would not necessarily show Appellant did not ingest marijuana on May 14 or from May 17 through May 19. An expert testified that there might be a positive result within a six-day window, but not within a ten-day window. The expert could not be positive without knowing more about the regularity of the consumption of marijuana and the potency of the marijuana or THC (tetrahydrocannabinol).
Appellant’s girlfriend testified that Pugh and Appellant did visit her in her hometown of Covington, Kentucky, but none of them used marijuana. She did admit that she talked to Appellant the night before her testimony and discussed the case with him.
The defense then called Mr. Paul William Plageman, who has known Melissa for about five or six years and lived in Covington for twelve years. He went to school with Appellant and Melissa. He remembered Appellant visiting Covington a couple of weekends in July, but he also remembered some visits from February 2 through February 4, but he testified that there was no involvement with marijuana.
Other individuals present on those weekends included Timothy Feeback and others. Mr. Feeback testified he lived in Crescent Springs, Kentucky, and knew Appellant, Appellant’s girlfriend, and Paul Plageman. He also remembered a weekend that Appellant visited home in February 1996; Feeback admitted drinking, having a good time, but he testified that no one was smoking marijuana. He mentioned the presence of Brumley, Pugh, and Appellant. He also testified that Appellant had visited with Pugh and Brumley the weekend of May 17, 1996, through May 19, 1996. He also mentioned another individual who was there that weekend was Krista Normeir. Again there was no smoking of marijuana smoked during that weekend.
*111 Staff Sergeant Clay Starner testified for the defense. He knew Appellant from 1994 through 1995, when they were involved in preparing for a marathon. That preparation continued from October 1994 through October 1995. This evidence was submitted to establish that Appellant was absent from some of the weekends mentioned by Grimm and Pugh.
Appellant was the last witness to testify for the defense. He testified concerning the statement that was taken by Staff Sergeant Deal. Appellant indicated that he was advised of his Article 31, UCMJ, rights, and that he initially invoked his rights and was allowed to leave the police station. He went to the barracks and thought about it for an hour and a half to two hours and then went back “to tell them what they want[ed] to hear.” In his statement, Appellant admitted that he was smoking marijuana at the Aquia Landing Campground. He also implicated his friend, Pugh, in the marijuana use as well as several others. Sergeant Wikel encouraged Appellant to make the statement, telling him: “This is better you do it this way. The CO wants cooperation.” Both Wikel and Deal told him: “Once the CO sees that you’re cooperating with our investigation nothing is going to happen to you from here; it’ll just [be] a slap on the wrist.”
Appellant admitted on the witness stand that he lied about smoking marijuana to avoid confinement. The military judge asked Appellant why he didn’t come forward earlier about Pugh’s marijuana use if he knew that the Marine Corps didn’t tolerate marijuana. He testified he did not want to squeal on his friends, as that would not be fair. He explained that the reason he reported his friends when he went back to see Wikel and Deal was to get the investigators off his back. The military judge refused to let the members ask questions about whether Appellant admonished his friends about the no-tolerance policy in the Marine Corps and whether he saw Pugh smoking marijuana earlier.
CLOSING ARGUMENT
Trial counsel’s comment on Appellant’s failure to contact a lawyer after invoking his right to counsel and stopping the police interview was as follows:
He says he gave a statement to avoid confinement. Well, let’s look at that. I mean I think that’s an interesting statement. Let’s — this is an important analysis that I think needs to be considered. He gets his first rights warning from Master Sergeant Crecilius and he invokes his right, he says, I want to see an attorney. And he leaves the premises and what does he do? He doesn’t see an attorney, he goes to the barracks. What would most people do in that situation if an individual was truly innocent? Wouldn’t they go see a lawyer and get some sort of legal protection? Would they come back and admit to guilt without the benefit of legal advice? What is more reasonable is that if he knows he’s guilty, he understands that there may be witnesses out there who can prove he’s guilty, he has an incentive to come back and try to minimize things by being as cooperative as possible and hope that he gets some sort of leniency. If he was innocent, the government is arguing, he would have gone and seen a lawyer, and used that shield.
Emphasis added.
The United States Navy-Marine Corps Court of Criminal Appeals said:
The trial counsel’s argument regarding the accused’s waiver of his rights and his written statement, taken in the context of the defense factual case, was not patently unreasonable. It is not error for the Government to comment upon the accused’s failure to support his claims. United States v. Webb, 38 M.J. 62, 66 (C.M.A.1993).[1]
The second part of the assigned issue concerns trial counsel’s comments on Appellant’s failure to call certain witnesses to support his defense. In his closing argument, the trial counsel stated:
It is interesting to note the absence of certain witnesses here today. You have before you a statement identifying Brum *112 ley, Lincoln, and Plummer, as being present at the scene of the Aquia Landing use. And they certainly could have come in and supported what Lance Corporal Haney has said to you. The question becomes, why are they not here?
Later, after the defense counsel argued, trial counsel returned to this point:
The third point, and final point, that I want to make is the defense counsel still has not provided an explanation as to why Brumley, Lincoln, Plummer, were not here to testify for their client—
MJ: Captain Rosenberg, I did not say anything the first time you mentioned this, and the defense did not object, but I’m going to make a sua sponte ruling not to allow you to make this kind of argument. The burden of proof is on the government to establish each and every element of the offense. The defense has no requirement to disprove any of the elements or to bring any evidence forward.
The members are instructed not to allow this type of argument to shift the burden to the defense and you must not speculate as to why various witnesses named are not present. The defense is under no obligation to bring forth any witness.
TC: I understand your ruling, ma’am.
The prosecutor’s comment on Appellant invoking his rights was designed to show that his statement, the second time he went to the CID office, was not coerced. The first time he was at the CID office, he invoked his rights and was released and allowed to go back to the barracks. He then voluntarily returned to the CID office. The aim of the prosecutor’s argument was to rebut Appellant’s suggestion that the confession the second time was coerced. Appellant was not coerced — he could have stopped the interrogation at any time, just as he did the first time, by invoking his right to counsel. In addition, the prosecutor’s comment about missing witnesses was meant to be facetious, since the trial counsel was essentially saying that the defense had already called numerous witnesses to say they had never saw Appellant use marijuana — -why not call some more witnesses to say essentially the same thing?
DISCUSSION — ISSUE I
The Government, in pointing out that Appellant knew that he could obtain counsel, was making the classic rebuttal argument to the defense theory of the case. The defense theory was that Appellant’s confession was involuntary and should be rejected. The Government’s argument was in response to this theory. The Government counsel was trying to demonstrate that Appellant was well aware he could stop the interview process by invoking his rights at any point, because he had already successfully done just that when they initially talked to him.
In general, the majority is correct that the invocation of rights under the Fifth Amendment or Article 31, UCMJ, would be inadmissible against an accused. But, when an appellant argues there was a coercive atmosphere, the government should be allowed to negate that argument by presenting evidence of the prior warnings, invocation of rights, termination of the interrogation, and the appellant’s voluntarily reinitiating the interrogation. The right against self-incrimination may not be used as a sword to prevent the Government from putting in context what actually occurred and to defend against Appellant’s assertion that his statement was coerced.
OPENING STATEMENTS
The defense may open the door for rebuttal evidence in the opening statement,[2] direct examination,[3] cross-examination,[4] or closing *113 argument.[5] When the facts mentioned in opening argument are pursued throughout the trial, the door is “effectively open[ ] for a great deal of rebuttal evidence.”[6]
In McAnderson, the defendants, all members of a Chicago street gang, were convicted of various roles in a conspiracy to commit terrorism.[7] In his opening statement, counsel for one of the defendants described “ ‘the El Rukns ... [as] a group of people who banded together for brotherhood, discipline in their lives, lives that were often chaotic, to put God in their lives.’ ”[8] Counsel next stated that some members of the El Rukns,
have been in trouble in the past. Some are still in trouble. But that’s no different than any other organization whether it be lawyers, a group of Catholics, or Jews, or Protestants or Muslims; it’s no different than any other organization. I venture to say even the Knights of Columbus have a few people in trouble every now and again.
Id. Counsel for the other defendants made similar assertions in their opening statements.[9]
Thus, in McAnderson, the role of the organization was pursued not only in the opening statement, but as part of the defense case. In rebuttal to these assertions, the prosecution introduced evidence of drug transactions between the co-conspirators and undercover agents.[10] Some of this was introduced as part of the prosecution’s case-inehief.[11] The exact rebuttal was not set forth in the opinion. The evidence of these drug transactions was meant to impeach the defendant’s contention that the organization was “fundamentally [a] religious organization.”[12]
In addition to the opening statement inviting a response, direct examination may do the same. One of the most recent examples is Beason. In Beason, the defense sought to take advantage of the Bruton rule, which provides that at a joint trial, a co-defendant’s confession that implicates the other defendant is not admissible against that other defendant. Id. at 967; see Bruton v. United States, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The Supreme Court held in Bruton that in limine instructions would be inadequate because co-defendant B cannot test by cross-examination the evidence set forth in A’s confession.[13] In Beason, the Government had introduced evidence that Beason was the kingpin who was selling drugs from his truck, hiding hundreds of thousands of dollars in its inside compartments.[14] Like most drug kingpins, he had some runners.[15] One of these was Washington. At trial, the defense asked the agent, who took a statement from Washington, whether the information they obtained regarding who knew where the money was in the truck, came from Washington, who had a prior drug arrest.[16] The government argued, and the trial judge agreed, that this opened the door for the agent to testify about other information from Washington that revealed the ownership of the truck, how the money was collected, how the money was given to Washington, and who was given directions concerning where to hide it in the truck.[17]
Just as the opening statement, direct examination, or cross-examination may open the door, or unlock the evidence door, closing *114 arguments may invite a response from an opponent. In Robinson,[18] the defense counsel in his closing argument told the jury that the government had not allowed the defendant to explain his side of the story and had breached its “duty to be fair.”
After this argument, the prosecutor, in a hearing outside the presence of the jury, contended that the defense had opened the door.[19] The judge agreed stating:
I will tell you what, the Fifth Amendment ties the Government’s hands in terms of commenting upon the defendant’s failure to testify. But that tying of hands is not putting you into a boxing match with your hands tied behind your back and allowing him to punch you in the face. That is not what it was intended for and not fair. I will let you say that the defendants had every opportunity, if they wanted to, to explain this to the ladies and gentlemen of the jury.[20]
The defense did not object, and in rebuttal, the prosecutor stated that the government had complied with its obligation to “play fair.”
[Defense counsel] has made comments to the extent the Government has not allowed the defendants an opportunity to explain. It is totally unacceptable. He explained himself away on tape right into an indictment. He explained himself to the insurance investigator, to the extent that he wanted to. He could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain.[21]
The court noted that “[d]efense counsel did not object to this closing and did not request a cautionary instruction. Nonetheless, the court included in the jury instruction the admonition that ‘no inference whatever may be drawn from the election of a defendant not to testify.’ ”[22]
In Young, the Supreme Court indicated that in order to “right the scale” the prosecutor responded to the defense counsel’s closing argument by expressing his personal opinion of the defendant’s guilt, vouched for his own credibility and the prestige of the prosecutor’s office, and exhorted the jury to “do [your] job.” The Supreme Court did not condone these remarks but found they did not constitute plain error.[23] The role of the appellate court is to weigh the impact of such remarks taking into account what prompted the remarks.[24]
However, the better remedy is for the trial judge “to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond.”[25] The Supreme Court in Young stated:
“Invited responses” can be effectively discouraged by prompt action from the bench in the form of corrective instructions to the jury and, when necessary, an admonition to the errant advocate.
... Arguably defense counsel’s misconduct could have warranted the judge to interrupt the argument and admonish him thereby rendering the prosecutor’s response unnecessary.[26]
Justice Brennan, writing for himself and two others, dissenting in part and concurring in part, stated “I agree fully with the Court’s conclusion that federal prosecutors do not have a ‘right’ of reply to defense improprieties, but must instead object to the trial judge and request curative action.”[27] However, he “completely disagree[d]” with the majority’s having apparently adopted an “in *115 vited error” analysis.[28] He noted the majority “rejects this asserted ‘right’ of reply, emphasizing instead that prosecutors have no ‘license to make otherwise improper arguments’ in response to defense rhetoric____”[29]
The Supreme Court concluded in Robinson that it did not have to address the issue of plain error because there was no error in the case.[30] Justice Marshall (joined by Justice Brennan) dissented because he believed the prosecution’s comments violated the Fifth Amendment.[31]
While Griffin v. California,[32] holds that the prosecutor may not on his own initiative, comment on the right to remain silent, the Supreme Court in Robinson found no violation of the privilege against compulsory self-incrimination where “the prosecutor’s reference to the defendant’s opportunity to testify is a fair response to a claim made by defendant or his counsel.”[33] In holding there was no plain error, the Supreme Court in Young looked at the defense counsel’s opening salvo, the jury’s understanding of the response, and the overwhelming evidence of guilt, and found there was no prejudice to the defendant.[34]
Likewise, in Darden,[35] the Supreme Court, in a 5-4 opinion, examined the “invited error” doctrine and again found that, although the defendant’s trial was not perfect, it was not fundamentally unfair. “Much of the objectionable content was invited by or was responsive to the opening summation of the defense.”[36] Parts of that summation were as follows:
The Judge is going to tell you to consider the evidence or the lack of evidence. We have a lack of evidence, almost criminally negligent on the part of the Polk County Sheriffs Office in this ease. You could go on and on about it____ They took a coincidence and magnified that into a capital case. And they are asking you to kill a man on coincidence.... The first witness that you saw was Mrs. Turman, who was a pathetic figure; who worked and struggled all of her life to build what little she had, the little furniture store; and a woman who was robbed, sexually assaulted, and then had her husband slaughtered before her eyes, by what would have to be a vicious animal. And this murderer ran after him, aimed again, and this poor kid with half his brains blown away____ It’s the work of an animal, there’s no doubt about it. So they come on up here and ask Citrus County people to kill the man. You will be instructed on lesser included offenses____ The question is, do they have enough evidence to kill that man, enough evidence? And I honestly do not think they do.[37]
In United States v. Grady,[38] this Court indicated that regardless of who initiated the argument as to command policies, the military judge has a sua sponte duty to give a curative instruction. However, this Court distinguished Grady in United States v. Kropf.[39]
Again, in Robinson,[40] the Supreme Court held that the prosecutor’s direct reference to the defendant’s failure to testify was not error because it was in response to the defense counsel’s argument that the government would not let the defendant testify.
In the instant case, the opening statement that defense counsel made and the cross- *116 examination of the agent, Deal, were far from “single passing” comments.[41] The courts have recognized the door may be open by either side. See, e.g., Shafer v. South Carolina, 532 U.S. 36, 37-39, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001) (finding that the prosecutor’s closing argument that Shafer and his two accomplices “might come back” opened the door to show future dangerousness and required an instruction of life without parole); United States v. Chance, 306 F.3d 356, 386-87 (6th Cir.2002) (holding that once defense counsel attempted to paint the picture of the appellant as a good law enforcement officer, the prosecution was entitled to “adduce some evidence to rebut [that] implication”). The defendant may not use his constitutional rights as a “shield” to “prevent the Government from contradicting the untruths and reasonable inferences that the fact finders could logically draw from the defense cross-examination.”[42]
The prosecution’s argument concerning the rights warnings, invocation of the rights, and termination of the interrogation was clearly fair rebuttal to show that Appellant’s confession was not coerced. Certainly, it rebutted the defense’s theory from the beginning of the trial, thus defense counsel did not object. Although the trial counsel’s comments implying that Appellant’s failure to consult with an attorney was proof of guilt went beyond fair rebuttal, the error was harmless beyond a reasonable doubt, in light of the strength of the Government’s case, which was supported by the testimony of two witnesses and Appellant’s admission. In addition, we must consider all of the trial counsel’s comments in the context of a response to the defense case that was presented. The comments were harmless beyond a reasonable doubt.
CONCLUSION
While I agree with the majority as to the disposition of Issues I and II, I disagree with the majority’s analysis of both issues. I would affirm the decision of the lower court. I find no merit in either issue. I also write separately to disassociate myself from this Court’s analysis of Issue II, which is based on its prospective rule set forth in United States v. Moreno, 63 M.J. 129, 135-41 (C.A.A.F.2006), and its misapplication of the Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), test. See Moreno, 63 M.J. at 144 (Crawford, J., concurring in part and dissenting in part).

. United States v. Haney, No. 9900878, slip op. at 5 (N.M.Ct.Crim.App. June 21, 2004).

. See, e.g., United States v. Houser, 36 M.J. 392, 400 (C.M.A.1993); United States v. Franklin, 35 M.J. 311, 317 (C.M.A.1992). But see United States v. Turner, 39 M.J. 259, 262 (C.M.A.1994) (stating that “nothing more than a single passing comment during defense counsel’s opening statement" may not be enough without more, to open the door) (emphasis added).

. See, e.g., United States v. Beason, 220 F.3d 964, 967 (8th Cir.2000) (after the defense sought to take advantage of the Bruton rule — the court held this opened the door for government rebuttal evidence).

. United States v. Havens, 446 U.S. 620, 627, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980).

. United States v. Young, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); United States v. Robinson, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988); Darden v. Wainwright, 477 U.S. 168, 178-82, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

. United States v. McAnderson, 914 F.2d 934, 946 (7th Cir.1990).

. Id. at 938.

. Id. at 945.

. Id.

. Id. at 945-46.

. Id. at 945 n. 4.

. Id. at 946.

. 391 U.S. at 132, 88 S.Ct. 1620.

. Beason, 220 F.3d at 966.

. Id. at 967-68.

. Id.

. Id.

. 485 U.S. at 27, 108 S.Ct. 864.

. Id. at 28, 108 S.Ct. 864.

. Id. (quotation marks omitted).

. Id. (quotation marks omitted).

. Id. at 28-29, 108 S.Ct. 864.

. 470 U.S. at 13, 105 S.Ct. 1038.

. Id.

. Id.

. Id. (citation omitted)

. Id. at 22, 105 S.Ct. 1038 (Brennan, J., dissenting in part and concurring in part).

. Id.

. Id. at 23, 105 S.Ct. 1038 (Brennan, J., dissenting in part and concurring in part).

. Robinson, 485 U.S. at 30, 108 S.Ct. 864.

. Id. at 37-45, 108 S.Ct. 864 (Marshall, J„ dissenting).

. 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

. Robinson, 485 U.S. at 32, 108 S.Ct. 864.

. See 470 U.S. at 17-20, 105 S.Ct. 1038.

. 477 U.S. at 183, 106 S.Ct. 2464.

. Id. at 182, 106 S.Ct. 2464.

. Id. at 179 nn. 5-8, 106 S.Ct. 2464 (citations and quotation marks omitted).

. 15 M.J. 275 (C.M.A.1983)

. 39 M.J. 107, 109 (C.M.A.1994).

. 485 U.S. at 32, 108 S.Ct. 864.

. See Turner, 39 M.J. at 262.

. United States v. Gilley, 56 M.J. 113, 125 (C.A.A.F.2001) (Crawford, C.J., concurring in . part).