# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3410

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Clyde Beason, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 11, 2000

Filed: July 28, 2000

_____

Before RICHARD S. ARNOLD, BEAM, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

BEAM, Circuit Judge.

A jury found Clyde Beason guilty of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. He was sentenced to 264 months' imprisonment. Beason appeals, asserting the district court[1] erred in denying his motion to suppress evidence and in admitting certain evidence during trial. We affirm.

_____

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

## I.    BACKGROUND

On September 1, 1998, James Hempen, an FBI agent assigned to a task force investigating drug trafficking activity at hotels, observed Beason, Joe Washington, and John LeBlanc in the parking lot of a Holiday Inn just off Interstate 55 in St. Louis County, Missouri.  The three individuals were with an old Buick and a newer model truck that was attached to a car trailer.  Hempen observed the three men going in and out of the truck and trailer.  He also saw them remove a rear tire from the trailer, place it in the trunk of the Buick and drive off.  His suspicions aroused, Hempen ran a computer check on the license plate of the Buick.  He discovered that the Buick was registered to Washington and that Washington had a prior criminal record for a drug offense.

After receiving this information, Hempen requested backup from the task force to further investigate the situation.  After the task force was assembled, one of the agents spoke with hotel management and learned that Washington had paid cash for the previous night's lodging and had checked out of the hotel at noon.  The agents set up surveillance around the hotel.  Shortly before 4:00 p.m., the agents observed Beason, Washington, and LeBlanc return to the parking lot in the Buick,  put the tire back onto the trailer, and load the Buick into the trailer.  Shortly thereafter, a Jeep Cherokee driven by Terrence Wilburn and Anthony Clark entered the hotel parking lot.  Officer Steven Curran then saw Beason exit from the driver's side of the truck,  remove a black duffel bag from a side compartment, and return to the cab of the truck with the bag.  Clark exited the Jeep and walked to the truck.  A few minutes later, Clark returned to the Jeep carrying a black duffel bag and drove off with Wilburn.  Beason, Washington, and LeBlanc left the hotel in the truck a short  while later.  The agents, with the assistance of St. Louis County police officers, stopped both the Jeep and the truck.

The Jeep was stopped after it was observed to have committed a traffic violation. In response to questioning by Officer Steven Steen, Clark stated that he was promoting

a concert in St. Louis. Steen then advised Clark of his <u>Miranda</u> rights. Clark stated that he understood his rights and continued to tell Steen that he was coming from the hotel where he had met an individual who had given him several thousand dollars to help finance the concert. Steen asked where the money was and Clark replied that it was in a black bag in the back seat of the Jeep. Steen then asked for and received Clark's permission to look at the bag. Wilburn also gave Steen consent to look at the bag. Steen then removed a black bag from the Jeep and searched it. He discovered several kilograms of cocaine. Clark and Wilburn were then placed under arrest.

In the meantime, the truck, containing Beason, Washington, and LeBlanc, had been stopped by Officer John Roussin of the St. Louis County police department. Roussin had not observed any traffic violation prior to stopping the vehicle. Other officers arrived at the scene to assist Roussin in the stop. Beason, Washington, and LeBlanc were asked to exit the truck after an officer saw them making suspicious movements indicative of hiding items or retrieving weapons. Officers then patted down the three men for weapons and conducted a quick protective sweep of the cab of the truck. When questioned by Curran, Washington stated that he had driven the truck from Houston to the hotel, and that LeBlanc and Beason had flown to St. Louis that morning and met him at the hotel. Washington indicated that all three men were headed to Kansas City to purchase a race car for Beason. Sergeant Wade Stuart questioned LeBlanc, who provided a conflicting story. LeBlanc stated that all three men had left Houston the day before and had been driving until the stop. During the conversation with LeBlanc, Stuart noticed a strong smell of burnt marijuana.

Stuart then approached Beason, who identified himself as the owner of the vehicle. Stuart indicated to Beason that, in light of the suspicious movements the three men had been making coupled with the odor of marijuana that had been detected on LeBlanc, he wanted permission to search the truck and trailer. Beason verbally consented to the search. Stuart went back to his car to retrieve a consent to search form, at which time he was informed by radio that agents had already found a large

quantity of narcotics in a black duffel bag in the Jeep. Stuart returned to Beason and had him read the consent form aloud. Beason then signed the form. Thereafter, officers searched the truck and trailer with Beason assisting. No contraband was discovered. When questioned by Stuart, Beason stated that he, along with Washington and LeBlanc, had come from Houston and were heading to Kansas City to buy a race car for an acquaintance whose name he could not recall.

Curran was then asked to go to the site of the Jeep stop to determine if the bag found in the Jeep was similar to the one he had observed Beason handling at the hotel. Curran identified the bag as being similar. Stuart was informed by radio that Curran had positively identified the bag. At that point, Stuart placed Beason, Washington, and LeBlanc under arrest.

At the police station, Washington waived his <u>Miranda</u> rights and gave FBI agent Todd Pooler a lengthy statement implicating himself and the others in narcotics trafficking. During the course of the interview, Washington also told Pooler that there was a large amount of cash hidden in the truck. Pooler relayed this information to Hempen who was conducting an inventory search of the truck. Approximately $270,000 was discovered secreted between the outside and inside walls of both sides of the truck. On September 2, 1998, officers obtained warrants to further search both the truck/trailer and the Buick. Approximately ten kilograms of cocaine, license plates from the vehicles, cellular phones and pagers, travel records, insurance records for the truck in the name of Clyde Beason, and other miscellaneous documents were found.

Beason and the other individuals were charged with conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Following the denial of his motion to suppress, Beason was found guilty by a jury.

For reversal, Beason claims: (1) the district court erred in not suppressing evidence; (2) the district court erred in admitting a non-testifying co-defendant's

statement in violation of <u>Bruton v. United States</u>, 391 U.S. 123 (1968)[2]; and (3) the district court erred in admitting a co-conspirator's statement under Federal Rule of Evidence 801(d)(2)(E).

## II.    DISCUSSION

### A.    Motion to Suppress

Beason argues that, in the absence of any traffic violation, officers lacked a valid basis to stop the truck and that the scope and duration of the subsequent detention was unreasonable.  Therefore, he asserts, any evidence stemming from events that followed the stop of the truck should be suppressed as fruit of the poisonous tree.  The district court disagreed, finding that reasonable suspicion supported the stop of the truck and that the scope and duration of the detention was reasonable.

We review the facts supporting the district court's denial of a motion to suppress for clear error.  <u>See</u> <u>United States v. Beatty</u>, 170 F.3d 811, 813 (8th Cir. 1999).  We review de novo the legal conclusions based on those facts.  <u>See id.</u>  We find that, even if we were to assume the officers lacked reasonable suspicion to stop the truck and that the subsequent detention was unreasonable,  Beason's consent to search the truck was "sufficiently an act of free will to purge the primary taint." <u>See id</u>.;  <u>United States v. Kreisel</u>, 210 F.3d 868, 869 (8th Cir. 2000) (consent that is an act of free will provides valid basis for search of truck independent of whether stop of truck comports with Fourth Amendment).  In determining whether Beason's consent was voluntary, we examine the totality of the circumstances. <u>See</u> <u>Beatty</u>, 170 F.3d at 813.

---

[2] In <u>Bruton</u>, the Supreme Court held that the right to confront adverse witnesses guaranteed by the Sixth Amendment bars the confession of a non-testifying co-defendant which implicates the defendant in the crime.

On the record before us, we have no difficulty concluding Beason's consent was voluntary. Officer Stuart specifically informed Beason that he wanted to search the truck and trailer because of the suspicious movements of the three men while seated in the truck as well as the odor of marijuana detected on LeBlanc. Beason then gave both oral and written consent to Stuart. The written consent form was signed after Stuart instructed Beason to read the form aloud to ensure he understood it. Beason was not handcuffed nor under arrest when he gave consent and there is no evidence that any of the officers threatened, coerced, or intimidated him. See id. at 814. In fact, Beason even assisted officers with the search by providing the keys to open various portions of the trailer. Finally, the events transpired on a public highway. See id.

Beason contends the consent was not voluntary because it followed upon the heels of the allegedly improper stop without any intervening circumstances. However, in light of the totality of the circumstances under which Beason gave consent, that factor standing alone does not render the consent involuntary. See United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994) (finding voluntary consent even though no intervening circumstance between prior Fourth Amendment violation and consent). In sum, we find that the district court did not err in denying the motion to suppress because Beason's consent sufficiently purged any taint that might have resulted from an allegedly illegal stop and detention.

## B. Evidentiary Issues

Beason next contends the district court erred in admitting the statement of a non-testifying co-defendant in violation of Bruton. Specifically, he claims the government improperly elicited testimony from Agent Pooler regarding that portion of co-defendant Washington's post-arrest statement in which Washington named Beason as the source of the money hidden in the truck. The government concedes that because Washington did not testify at trial, such testimony would ordinarily be inadmissible under Bruton.

However, it argues that counsel for Beason "opened the door" to such evidence through his prior cross-examination of Agent Hempen.

At trial, Hempen testified on direct examination that he had received information from another agent informing him about currency hidden in the truck/trailer. On cross-examination, counsel for Beason elicited the following testimony:

Q:     Agent Hempen, you testified that you received information about money being in this tractor-trailer?
A:     Yes, sir.
Q:     And you know where that information came from, don't you?
A:     Came from one of the people in our task force called me.
Q:     And you know where they got it, don't you?
A:     They got it from--yes, sir, I do.
Q:     Came from Joe Washington?
A:     Yes, sir.
Q:     This information did not come from Mr. Clyde Beason, did it?
A:     No, sir.
Q:     And Joe Washington, this is the individual that you already knew had a prior drug arrest, didn't you?
A:     Correct.

The district court then allowed the prosecution to elicit further testimony from Pooler about Washington's post-arrest statement. This information was that Beason received the money from the individuals in the Jeep and had given it to Washington to hide in the truck.

Beason argues the court erred in admitting Pooler's testimony. He claims it was necessary for his counsel to clarify on cross-examination that he was not the source of the agents' information regarding the hidden currency, because being the owner of the

truck, the jury would naturally make such an assumption. However, Beason argues, his cross-examination of Hempen did not open the door to further testimony from Pooler regarding Washington's post-arrest statement. The district court rejected this argument. It concluded that any attempt to dispel the assumption that Beason was not the source of the information regarding the money was adequately accomplished once Hempen testified to this effect. The court concluded that counsel's further questioning regarding Washington had opened the door sufficiently to permit Pooler's testimony. However, the court limited Pooler's testimony of Washington's post-arrest statement strictly to those comments regarding the hidden currency.

The trial court has broad discretion in the admission of evidence and its decision will be overturned on appeal only if there has been an abuse of discretion. See United States v. Rogers, 939 F.2d 591, 594 (8th Cir. 1991). "It is fundamental that where the defendant 'opened the door' and 'invited error' there can be no reversible error." United States v. Steele, 610 F.2d 504, 505 (8th Cir. 1979). We have allowed the use of otherwise inadmissible evidence to clarify or rebut an issue opened up by defense counsel on cross-examination. See United States v. Womochil, 778 F.2d 1311, 1315 (8th Cir. 1985) (no abuse of discretion in allowing government to clarify false impression created on cross-examination); United States v. Finch, 16 F.3d 228, 233 (8th Cir. 1994) (under "opening the door" theory, evidence introduced must rebut something that has been elicited on cross-examination).

Beason's theory of defense at trial was that Washington orchestrated the events in question, while Beason was an unknowing bystander. We find defense counsel's questioning, stressing not only that information regarding the hidden currency did not come from Beason, but also that it came from Washington, an individual with a prior drug record, did more than simply dispel an assumption that Beason provided the information. It could have created a misleading inference to the jury that Washington was the "bad guy," thereby bolstering Beason's defense theory. Although the inference may not be as powerful as the government contends, we cannot say the district court

abused its substantial discretion by allowing the government to clarify or rebut any false impression created on cross-examination.  See United States v. Durham, 868 F.2d 1010, 1012 (8th Cir. 1989).  Thus, we find that admission of the evidence in question did not violate Bruton.

Finally, we have considered Beason's argument that the district court erroneously admitted a statement by co-conspirator Clark.  Our review of the record satisfies us that the district court did not err in finding that the challenged statement  was made in the course of and in furtherance of the conspiracy as required by Federal  Rule of Evidence 801(d)(2)(E).

## III.  CONCLUSION

For the foregoing reasons, we find no reversible error  and affirm the judgment of conviction entered by the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.