UNITED STATES, Appellee

v.

Thomas M. HANEY, Lance Corporal
U.S. Marine Corps, Appellant

No. 05-0047

Crim. App. No. 9900878

United States Court of Appeals for the Armed Forces

Argued May 3, 2005

Decided September 29, 2006

GIERKE, C.J., delivered the opinion of the Court, in which
ERDMANN, J., joined.  CRAWFORD, J., filed a separate opinion
concurring in part and dissenting in part, and concurring in the
result.  EFFRON, J., filed a separate opinion concurring in part
and in the result.  BAKER, J., filed a separate opinion
concurring in part and dissenting in part, and concurring in the
result.

Counsel

For Appellant:  Lieutenant Stephen C. Reyes, JAGC, USNR
(argued); Lieutenant Commander Eric J. McDonald, JAGC, USN (on
brief); Major Charles R. Zelnis, USMC.

For Appellee:  Colonel William K. Lietzau, USMC (argued);
Commander Charles N. Purnell, JAGC, USN, Major Raymond E. Beal
II, USMC, and Lieutenant Mark H. Herrington, JAGC, USNR (on
brief).

Military Judge:  L. L. Jowers


**This opinion is subject to revision before final publication.**

Chief Judge GIERKE delivered the opinion of the Court.

INTRODUCTION

This case presents two issues. We granted review of one issue assigned by Appellant and specified a second issue.[1]

The assigned issue asks us to determine whether trial counsel's closing argument included an improper comment on Appellant's invocation of his Article 31, Uniform Code of Miltary Justice (UCMJ)[2] rights to terminate an interrogation and to seek the assistance of legal counsel. In the unique factual context of this case, even if we assume error in the trial counsel's argument, we hold that any error was harmless beyond a reasonable doubt.

The specified issue requires this Court to address whether appellate defense counsel was ineffective in requesting multiple enlargements of time at the lower court -- which ultimately

---

[1] The granted issue is:

> I. WHETHER TRIAL COUNSEL COMMITTED PLAIN ERROR BY IMPROPERLY COMMENTING ON APPELLANT'S EXERCISE OF ARTICLE 31 RIGHTS.

This Court specified the following issue:

> II. IN LIGHT OF TOOHEY V. UNITED STATES, 60 M.J. 100 (C.A.A.F. 2004) AND DIAZ V. JUDGE ADVOCATE GENERAL OF THE NAVY, 59 M.J. 34 (C.A.A.F. 2003) WHETHER DEFENSE COUNSELS' MULTIPLE REQUESTS FOR EXTENSIONS OF TIME CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL.

United States v. Haney, 61 M.J. 19 (C.A.A.F. 2005).

[2] 10 U.S.C. § 831 (2000).

resulted in over seven years of appellate delay.  We address this issue in light of our recent holding in United States v. Moreno,[3] that further developed the cases identified in the specified issue, to determine if Appellant was prejudiced by any deficiency in appellate representation.  Although we conclude that the extraordinary unexplained delay resulted in a due process violation, we also conclude that this error was harmless beyond a reasonable doubt.  In light of this conclusion, we hold that that any deficiency by appellate defense counsel at the lower court was not prejudicial, and therefore, Appellant was not denied effective assistance of counsel.

We now address these two issues in turn.

I.  COMMENTARY ON APPELLANT'S ARTICLE 31, UCMJ, RIGHTS

A.  BACKGROUND AND TRIAL DEVELOPMENTS

Appellant was suspected of drug misconduct.  Master Sergeant (MSgt) Crecilius, a Criminal Investigation Division (CID) investigator, initially interviewed Appellant as to his alleged drug misconduct.  At the outset of this interview, Appellant waived his Article 31, UCMJ, rights, agreed to talk to the investigator, and initially denied using marijuana.  However, Appellant later invoked his Article 31, UCMJ, rights, requested an attorney, terminated the interview, and departed.  Appellant returned to his barracks room.

---

[3] 63 M.J. 129 (C.A.A.F. 2006).

3

About three hours later, Appellant on his own initiative went back to the CID. Staff Sergeant (SSgt) Deal, an investigator with the CID, began a second interrogation of Appellant. Appellant waived his Article 31, UCMJ, rights and confessed to wrongfully using marijuana on one occasion. Additional investigation developed evidence relating to several offenses, and later Appellant's case was referred to a special court-martial.

A court-martial panel of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of marijuana use, one specification of distribution of marijuana, and one specification of making a false official statement.[4]

As part of the trial on the merits before a court-martial panel, Appellant challenged the truthfulness of his confession to one wrongful use of marijuana offense. The defense proffered the theory that Appellant fabricated his confession to drug use because of a coercive interrogation and in order to avoid harsh

---

[4] This was in violation of Articles 107 and 112a, UCMJ, 10 U.S.C. §§ 907, 912a (2000). Appellant was sentenced to 107 days confinement, forfeiture of $600 pay per month for six months, reduction to pay grade E-1, and a bad-conduct discharge. The convening authority approved the adjudged sentence. The United States Navy-Marine Corps Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion. United States v. Haney, No. NMCCA 9900878 (N-M. Ct. Crim. App. June 21, 2004).

punishment.[5]  In his opening statement, the trial defense counsel

stated to the panel:

> Mr. Haney, incidentally, is going to testify.  So at least
> you'll know that.  That is the defendant.  The reason is
> you're going to hear evidence from him as to the promises
> being made and the fact that, if you say a couple of
> things, don't worry about it, everything will go away.
> You're going to hear that he went to see the investigating
> officer twice; the first time he walked out because of
> these alleged promises, and then he came back because there
> was a promise that if he did not state his involvement he
> would be tossed in the brig, but if he did make a statement
> as to anything that was talked about here, don't worry
> about it, nothing is going to happen . . . .

The prosecution case included two pieces of evidence to

prove the drug offenses:  testimony concerning Appellant's

signed confession to one use of marijuana, and testimony from

members of Appellant's battalion corroborating Appellant's

alleged marijuana use and distribution.

The first prosecution witness, SSgt Deal, an investigator

with CID, testified regarding Appellant's confession to smoking

marijuana on one occasion.  SSgt Deal testified that he gained

information that Appellant, as well as other members of

Appellant's battalion, were allegedly using drugs.  Because of

this information, SSgt Deal interrogated Appellant on June 20,

1996.  SSgt Deal testified that he properly advised Appellant of

---

[5] At trial, defense counsel did not make a motion to suppress
Appellant's confession to SSgt Deal.  The coerced confession
theory was presented only to the panel during presentation of
the case on the merits.

his Article 31, UCMJ, rights and Appellant "waived his rights, and provided [the incriminating] statement."

In cross-examination of the Government witnesses, the defense attempted to bolster the theory, presented in the defense's opening statement, that Appellant's confession to one incident of marijuana use was fabricated as a result of CID coercion. This line of questioning related to alleged conditional promises of leniency that interrogators made to Appellant if he admitted to wrongful drug use.

Later, during the defense's case-in-chief, trial defense counsel elicited from Appellant other circumstances regarding the interrogation of Appellant, in general, and Appellant's prior invocation of his Article 31, UCMJ, rights, in particular. Appellant testified that MSgt Crecilius first attempted to interview him about his alleged wrongful drug use.[6] Appellant testified that MSgt Crecilius explained Appellant's "five rights," and asked Appellant if he "wish[ed] to talk." According to Appellant, MSgt Crecilius then asked Appellant whether he was involved with smoking marijuana with members of his battalion. Appellant stated that he denied smoking marijuana at that point, and requested an attorney. Appellant stated that after he left the room, CID agents took his

---

[6] MSgt Crecilius did not testify, but on cross-examination, SSgt Deal corroborated MSgt Crecilius's presence at an initial meeting prior to his meeting with Appellant.

fingerprints and his photograph, and he returned to his barracks room.  Appellant further testified that the investigator's threat that he would be placed into confinement if he did not give them information induced him later to return to CID and falsely to confess to SSgt Deal.[7]

In his initial closing argument, trial counsel addressed, and attempted to rebut, the defense assertion that Appellant had been induced to make a false confession.  Trial counsel argued:

> [Appellant] says he gave a statement to avoid confinement.  Well, let's look at that.  I mean I think that's an interesting statement.  Let's -- this is an important analysis that I think needs to be considered.  <u>He gets his first rights warning from Master Sergeant Crecilius and he invokes his right, he says, I want to see an attorney</u>.  And he leaves the premises and what does he do?  He doesn't see an attorney, he goes to the barracks.  <u>What would most people do in that situation if an individual was truly innocent?  Wouldn't they go see a lawyer and get some sort of legal protection?  Would they come back and admit to guilt without the benefit of legal advice</u>?  What is more reasonable is that if he knows he's guilty, he understands that there may be witnesses out there who can prove he's guilty, he has an incentive to come back and try to minimize things by being as cooperative as possible and hope that he gets some sort of leniency.  <u>If he was innocent, the government is arguing, he would have gone and seen a lawyer, and used that shield</u>.

Emphasis added.

Defense counsel made no objection to these remarks.  Moreover, trial defense counsel, in his closing argument repeated the false confession theory stating:

---

[7] Appellant stated:  "I didn't want to end up in confinement so I thought, well, if I go back and tell them what they want to hear, I will not end up in confinement."

Then Deal says, well, we're after big fish, this is just a slap on the wrist, there's really nothing to worry about, kind of thing. And again, you heard the comments from him that I specifically read. Wouldn't that push – and this is what you have to examine. What does that mean in his mind? . . . [a]nd here's a man –- a young man never been exposed to this kind of interrogation, so he goes back and thinks about it, well, if nothing is going to happen, I'll give them what they want.

## II. DISCUSSION

Referring to the adversarial trial setting, the Supreme Court has stated that "[i]t is important that both the defendant and prosecutor have the opportunity to meet fairly the evidence and arguments of one another."[8] In both Robinson[9] and Lockett v. Ohio,[10] the Supreme Court reaffirmed "the principle that prosecutorial comment must be examined in context . . . ."[11] In both these cases, the Supreme Court held that a prosecutor's argument was not an impermissible comment regarding an accused Fifth Amendment rights in light of the defense trial tactics in the case.[12]

Consistent with this principle, this Court has also stated:

Trial counsel has the duty of prosecuting a case, and he is permitted to comment earnestly and forcefully on the

---

[8] United States v. Robinson, 485 U.S. 25, 33 (1988).
[9] Id. at 33-34.
[10] 438 U.S. 586 (1978).
[11] Robinson, 485 U.S. at 33; Lockett, 438 U.S. at 595. This Court also has emphasized the importance of context in evaluating a prosecutor's argument stating the fundamental rule that "[a] prosecutorial comment must be examined in light of its context within the entire court-martial." United States v. Carter, 61 M.J. 30, 33 (C.A.A.F. 2005); see, e.g., United States v. Baer, 53 M.J. 235, 238 (C.A.A.F. 2000).
[12] Robinson, 485 U.S. at 33-34; Lockett, 438 U.S. at 595.

evidence, as well as on any inferences which are supported reasonably by the testimony. He may strike hard blows, but they must be fair. If his closing argument has a tendency to be inflammatory, we must make certain it is based on matters found within the record. Otherwise it is improper. The issues, facts, and circumstances of the case are the governing factors as to what may be proper or improper. We, therefore, must evaluate the argument in the light of this record.[13]

Appellant asserts that the Government's closing remarks amounted to using his invocation of Article 31, UCMJ, rights as substantive evidence against him, in violation of Military Rule of Evidence (M.R.E.) 301(f)(3). M.R.E. 301(f)(3) provides: "The fact that the accused during official questioning and in exercise of rights under the Fifth Amendment to the Constitution of the United States or Article 31, remained silent, refused to answer a certain question, requested counsel, or requested that the questioning be terminated is inadmissible against the accused."

M.R.E. 301(f)(3) reaffirms the long-standing general rule that trial counsel cannot make "capital of accused's exercise of his Article 31 rights."[14] In light of this prohibition, we

---

[13] United States v. Doctor, 7 C.M.A. 126, 133-34, 21 C.M.R. 252, 259-60 (1956) (citations omitted); see United States v. Ruiz, 54 M.J. 138, 143-44 (C.A.A.F. 2000).

[14] See United States v. Kemp, 13 C.M.A. 89, 98, 32 C.M.R. 89, 98 (1962); see, e.g., Carter, 61 M.J. at 34 (holding that repeated references to "uncontroverted evidence" of an accused's guilt throughout closing argument was reversible error, where the comments were general, and not "tailored to the defense credibility argument"); United States v. Gilley, 56 M.J. 113, 123 (C.A.A.F. 2001) (holding that there was no material prejudice arising from trial counsel's repeated references to an

consider Appellant's assertion of improper trial counsel comment on his invocation of constitutional rights in the context of the trial developments in this case.[15]

We also note that there was no defense objection to trial counsel's argument. This Court has stated regarding a trial counsel's argument:

> Failure to object to improper argument before the military judge begins to instruct the members on findings constitutes waiver. In the absence of an objection, we review for plain error. Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused.[16]

In the view of the Government, the defense's theory that interrogating agents coerced Appellant to obtain his confession opened the door to the trial counsel's fair argument rebutting this theory.[17] Arguably, this permissible argument would further suggest that Appellant may not have felt the degree of coercion that he claimed compelled him to sign a false confession. After

---

accused's invoking his right to counsel); Ruiz, 54 M.J. at 143 (holding that, where an accused took the stand to testify in his own defense and denied culpability for the crime of shoplifting, trial counsel's commentary regarding this theory was made in furtherance of counsel's "'duty to . . . point out the inconsistencies and' unbelievable nature of appellant's story").
[15] See Carter, 61 M.J. at 33; Baer, 53 M.J. at 238 (stating that "the argument by a trial counsel must be viewed within the context of the entire court-martial. The focus of our inquiry should not be on words in isolation, but on the argument as "viewed in context.") (citations omitted).
[16] United States v. Fletcher, 62 M.J. 175, 179 (C.A.A.F. 2005) (citations omitted).
[17] See Carter, 61 M.J. at 33; see, e.g., Gilley, 56 M.J. at 120-21 (citing Robinson, 485 U.S. at 32).

all, the interrogating agents respected Appellant's assertion of his right to consult with counsel and terminated the interview. However, it was Appellant's choice not to see a lawyer.

The defense asserts that trial counsel went beyond fair rebuttal when he stated "[if] he was innocent, the government is arguing, he would have gone and seen a lawyer, and used that shield." Arguably, this statement does not address and rebut the claim of false confession, but rather argues, as evidence of Appellant's guilt, his invocation of his right to consult a lawyer and his failure to actually consult with a lawyer. Accordingly, Appellant asserts that it was not fair rebuttal for trial counsel to argue essentially that Appellant was guilty because he did not consult a lawyer.

We need not presently resolve this matter. It is sufficient to say that we do not condone the entire argument of the trial counsel in the unique facts of this case and caution counsel against making such an argument. However, even assuming, arguendo, that trial counsel's closing argument did improperly comment on Appellant's right to invoke his Article 31, UCMJ, rights and his constitutional right to consult with counsel, we conclude that any error was harmless beyond a reasonable doubt for two reasons.[18]

---

[18] See, e.g., United States v. Young, 470 U.S. 1, 11-12 (1985) (stating that "[i]nappropriate prosecutorial comments, standing

11

First, the record establishes that Appellant raised the matter of Appellant's invoking his Article 31, UCMJ, rights and constitutional right to counsel. During his testimony on direct examination, Appellant made the initial evidentiary disclosure that he exercised his Article 31, UCMJ, rights. The Government did not inject Appellant's invocation of his rights into evidence. Rather, the matter was brought out by trial defense counsel to support the defense theory of the case that his admission to one incident of marijuana use was fabricated in response to false CID promises of leniency and coercion.

Second, in our view, the strength of the Government's case did not hinge upon Appellant's confession to one use of marijuana. Rather, the Government presented the members with detailed testimony from two witnesses corroborating Appellant's criminal misconduct -- one of whom testified to having used marijuana with Appellant, and another who placed Appellant at the scene of an alleged incident of drug use.

Accordingly, we conclude that any error in the closing argument was harmless beyond a reasonable doubt,[19] and we affirm the decision of the lower court finding no merit as to Issue I.

---

alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding").

[19] See United States v. Carpenter, 51 M.J. 393, 396 (C.A.A.F. 1999) (holding that, in light of the appellant's failure to object to the prosecution's rebuttal argument against him, any error in the prosecution's argument was harmless).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

We next address the specified issue:  whether counsel was ineffective in requesting multiple enlargements of time to submit Appellant's case for review.  Appellant argues that counsel's repeated requests for enlargements of time deprived him of due process of law and amounted to ineffective assistance of counsel.[20]

### A.  LAW RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL

In United States v. Polk,[21] this Court applied Strickland v. Washington, 466 U.S. 668, 695 (1984) using a three-pronged test to determine whether counsel has been ineffective:  (1) "Are the allegations made by appellant true; and, if they are, is there a reasonable explanation for counsel's actions in the defense of the case?"; (2) If the allegations are true, "did the level of advocacy 'fall[] measurably below the performance . . . [ordinarily expected] of fallible lawyers?'"; and (3) "If ineffective assistance of counsel is found to exist, 'is . . . there . . . a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt?'"

---

[20] Appellant also alleged various claims of ethical violations based on conflicts of interest resulting from changes in attorneys assigned to his case.  We find nothing in the record indicating an actual conflict of interest between attorneys assigned to his case which would have hindered the adequacy of representation.  See Mickens v. Taylor, 535 U.S. 162, 175 (2002) (citing Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)).

[21] 32 M.J. 150, 153 (C.M.A. 1991).

The claim of ineffective assistance in this case is rooted in the failure of appellate defense counsel to perform the specific duty of filing pleadings at the lower court in a timely manner. We will evaluate this claim as we do a claim of a failure of counsel to perform other duties such as to make a motion or to suppress evidence. Therefore, Appellant must show that there is a reasonable probability that he was prejudiced by this alleged deficiency of appellate counsel.[22]

Because the ultimate question of prejudice arising from the alleged ineffective assistance of counsel is closely tied in this case to the issue of appellate delay, we analyze the specified issue in light of our recent holding in Moreno.[23]

Appellant asserts that the seven years of appellate delay resulted directly from the deficient performance of appellate counsel. Attributing the languishment of his case to inadequate staffing of appellate counsel, Appellant asserts that "the failures by the Government led to a system of appellate review that diminished rather than preserved Appellant's rights." We proceed to apply our recent holding in Moreno to evaluate whether there was a due process violation in this case and, if so, whether Appellant was prejudiced.

---

[22] See United States v. McConnell, 55 M.J. 479, 481 (C.A.A.F. 2001); United States v. Napoleon, 46 M.J. 279, 284 (C.A.A.F. 1997).
[23] 63 M.J. at 141.

B.   APPLICABILITY OF UNITED STATES V. MORENO

In Toohey v. United States,[24] this Court identified four factors in determining whether post-trial delay violates due process rights:  "(1) length of the delay; (2) reasons for the delay; (3) appellant's assertion of his right to a timely appeal; and (4) prejudice to the appellant."[25]  More recently in Moreno, this Court explained:  "Once this due process analysis is triggered by a facially unreasonable delay, the four factors are balanced, with no single factor being required to find that post-trial delay constitutes a due process violation."[26]

### 1.   Length of the delay

We note at the outset that this case presents a particularly egregious delay -- 2,639 days.  This translates to over seven years from sentencing to the Court of Criminal Appeals opinion.[27]  In accordance with Moreno, we conclude this

---

[24] 60 M.J. 100 (C.A.A.F. 2004).  In Toohey, this Court held that the appellant established a threshold showing of facially unreasonable delay, even without showing prejudice.  Id. at 104. The Court remanded the case to the Navy-Marine Corps Court of Criminal Appeals for it to determine whether the lengthy delay violated the appellant's Fifth Amendment right to due process and whether the delay warranted some form of relief.  Id.

[25] Id. at 102 (deriving these factors from the Supreme Court's speedy trial analysis in Barker v. Wingo, 407 U.S. 514, 530 (1972)).

[26] 63 M.J. at 136.

[27] It is also noteworthy that it took 1,179 days (approximately three years, two months) for the briefs to be filed after the Court of Criminal Appeals docketed the case.  After the case was submitted, it took over 654 days (approximately one year, nine months) to decide the case.

delay is facially unreasonable, and we proceed to perform a full due process analysis.[28]

## 2. Reasons for the delay

Here, we focus on the degree of the Government's responsibility for the delay, as well as on any factors "attributable to an appellant."[29] Appellate counsel assigned to Appellant's case requested a total of twenty-three enlargements of time.[30] From the standpoint of Moreno, we do not weigh this factor against Appellant.[31]

Indeed, we have held that where "a lack of 'institutional vigilance'" causes a case to languish on appeal, an appellant is "effectively denied . . . his statutory right to the free and timely professional assistance of detailed military appellate defense counsel."[32]

---

[28] Moreno, 63 M.J. at 136.

[29] Id.

[30] Appellate counsel was first assigned to Appellant's case in June 1999. The first attorney assigned as appellate defense counsel requested a total of eighteen requests for enlargement of time. This attorney was transferred from the Appellate Defense Division. In August 2001 or thereabout, the next attorney took over Appellant's case, and requested five enlargements of time. Thus, Appellant's counsels requested a combined twenty-three enlargements of time prior to filing a brief.

[31] Id. at 137.

[32] See Article 70, UCMJ, 10 U.S.C. § 870 (2000); United States v. Dearing, __ M.J. __ (21) (C.A.A.F. 2006) (holding that "[c]onsistent with our decisions in Diaz and Moreno, we decline to hold Appellant responsible for the lack of 'institutional vigilance' which should have been exercised in this case"); see Diaz v. Judge Advocate General of the Navy, 59 M.J. 34, 39-40 (C.A.A.F. 2003).

### 3. Assertion of the right to a timely review and appeal

We observe that Appellant did not assert his right to a timely review and appeal before this case arrived at this Court. However, the underlying ineffective assistance of counsel allegation relates to the appellate defense counsel improperly requesting an excessive number of enlargements at the lower court. In light of this action by Appellant's appellate defense counsel, we cannot fault Appellant for failing to assert his right to a timely review. Accordingly, we do not weigh this factor against Appellant.

### 4. Prejudice from the delay

A final factor is any prejudice either personally to the appellant or the presentation the appellant's case that arises from the excessive post-trial delay.[33] We have determined that Appellant received only 107 days of adjudged confinement and has brought no claim of oppressive incarceration. Appellant was out on appellate leave during the delay period, and thus, has no meritorious claim of "particularized anxiety."[34]

### 5. Conclusion –- Barker factors

Under Moreno, we balance the factors to determine whether Appellant's due process rights were violated. In this case, we are concerned with two main factors. First, the length of the delay in this case is one of the longest we have seen –- seven

---

[33] Moreno, 63 M.J. at 138-39.
[34] Dearing, ___ M.J. at ___ (18); Moreno, 63 M.J. at 140.

years.  Secondly, this inordinate delay is unexplained.  Neither the appellate defense counsel's repeated requests for extensions of time nor the mere circumstance of an extremely large caseload adequately explains this unreasonable delay.[35]  Although we conclude Appellant suffered no prejudice under the factors set forth in Barker, we conclude the egregiousness of the unexplained delay in this case was such that the perception of fairness of the military justice system is potentially jeopardized.[36]  Accordingly, we find a due process violation.[37]

### 6.  Relief

Having found a due process violation, we now test for harm and prejudice.[38]  Based on our analysis under Issue I, the present case does not involve either the denial of properly and timely relief on another meritorious issue or particularized anxiety or hardship that might arise from a rehearing.  Moreover, based on our review of the entire record, we conclude that there is not any cognizable prejudice arising from the

---

[35] The Government's motions to file the declarations of Commander S. D. Rhoades and Mr. Robert Troidl are granted, and we have considered the contents of those declarations.

[36] United States v. Toohey, 63 M.J. 353, 362 (C.A.A.F. 2006) (holding that "where there is no finding of Barker prejudice, we will find a due process violation only when, in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system"); United States v. Harvey, __ M.J. __ (28) (C.A.A.F. 2006).

[37] Harvey, __ M.J. at __ (28).

[38] Id.

18

delay in this case.[39] Appellant served only 107 days of confinement and was likely released on appellate leave by the end of June 1997. We therefore conclude the delay in this case was harmless beyond a reasonable doubt.[40] In light of this conclusion, we revisit the issue of ineffective assistance of counsel.

In order to prevail on the prejudice prong of an ineffective assistance of counsel claim, an appellant must ultimately show that "the deficient performance prejudiced the defense."[41] Based on the analysis above, and guided by Moreno, we conclude that Appellant was not prejudiced by any deficiency in the appellate representation at the lower court. Therefore, we hold that Appellant was not denied the effective assistance of counsel.[42]

---

[39] Cf. Dearing, __ M.J. at __ (28-29) (concluding prejudice arose from counsel's inefficacy because appellant raised a meritorious claim on appeal, for which this Court granted relief).
[40] In United States v. Allison, 63 M.J. 365, 370 (C.A.A.F. 2006), this Court acknowledged that "[a]s a general matter, we can dispose of an issue by assuming error and proceeding directly to the conclusion that any error was harmless." We proceeded in Allison to assume a denial of a right to speedy review and concluded that the error was harmless. Id. at 371. In light of our conclusion of harmless error in the present case, we could have followed this approach. But the appellate delay here is the longest this Court has recently reviewed. The particularly egregious delay -- 2,639 days -- invites the detailed due process analysis we present in this opinion.
[41] Strickland, 466 U.S. at 687.
[42] But see Dearing, __ M.J. at __ (26).

## DECISION

As to the assigned issue, the holding of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed. As to the specified issue, we answer the question in the negative. The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

CRAWFORD, Judge (concurring in part, dissenting in part, and concurring in the result):

The majority overlooks the fundamental nature of our adversary system and precedent from this Court and the Supreme Court, and gives little advice to the bench and bar that is helpful. I agree with the result but dissent from part of the rationale.

It is important to separate what was proper prosecution argument from what was improper. Based on the opening statements and examination of the witnesses, the prosecution could legitimately rebut the defense argument that Appellant's statement was coerced by arguing the background facts surrounding the rights warnings statements, Appellant's termination of the interrogation, and his voluntary return to the police to give a statement. However, it would be improper to argue that a "truly innocent" individual would see a lawyer, whereas a guilty person "has an incentive to come back and try to minimize things." The first approach is permissible. The latter is impermissible.

The first comment and its expansion when placed in context is clearly reasonable. The best evidence any counsel can have is the statement of the party opponent, in this case, Appellant's confession. The defense counsel recognized that and sought to discount its impact by using the small window of

urinalysis testing.  When the defense seeks to use the Fifth
Amendment, Article 31, Uniform Code of Military Justice (UCMJ),
10 U.S.C. § 831 (2000), and the Military Rules of Evidence as a
sword, the prosecution has an absolute right to respond with
fair rebuttal.

The prosecutor's statement placed in context constitutes
fair rebuttal to the defense theory of the case which began with
defense counsel's opening statement:

> You're also going to hear from -- Mr. Haney,
> incidentally, is going to testify.  So at least you'll
> know that.  That is the defendant.  The reason is
> you're going to hear evidence from him as to the
> promises being made and the fact that, if you say a
> couple of things, don't worry about it, everything
> will go away.  You're going to hear that he went to
> see the investigating officer twice; the first time he
> walked out because of these alleged promises, and then
> he came back because there was a promise that if he
> did not state his involvement he would be tossed in
> the brig, but if he did make a statement as to
> anything that was talked about here, don't worry about
> it, nothing is going to happen.  So that's the issue
> regarding Sergeant Deal who handled the investigation.
> And, again, you're going to hear all of this.

### PROSECUTION CASE

Private Crist D. Pugh testified that he had seen Appellant
use marijuana over a dozen of times.  This happened in
Covington, Kentucky, on a weekend, July 28, 1995, through July
30, 1995.  When they arrived in Covington, they met Appellant's
girlfriend, Lance Corporal Melissa D. Sandlin, at a hotel room
with five or six people and smoked seven or eight "joints" of

marijuana that Appellant brought.  Between August 18, 1995, and the August 20, 1995, they again drove to Covington and met Appellant's friend, Paul, and Appellant's girlfriend.  This time they shared one joint.  Pugh and Appellant went to Covington again on the weekend of October 20, 1995, through October 22, 1995.  They were accompanied by Lance Corporal Brumley and Lance Corporal Winters on the trip.  They stayed at the same hotel and used marijuana on various occasions.  At the hotel, they were met by Lance Corporal Sandlin and purchased marijuana from Sandlin's uncle.

On February 2, 1996, through February 4, 1996, Pugh and Appellant went back to Covington, Kentucky, with Brumley.  This time they met with Paul and another friend, Tim, Appellant's girlfriend, and another female.  They smoked marijuana on various occasions.  During the weekend of May 17, 1996, through May 19, 1996, Pugh, Appellant, and Appellant's girlfriend went on a camping trip to Aquia Landing Campground, where they used marijuana.  During the months of February 1996 and March 1996, they went to Stafford, Virginia, where they smoked marijuana.

A camping trip in May 1966 involved Appellant, Brumley, Lance Corporal Williams, Private First Class Crouse, Lance Corporal Smith, Lance Corporal Plummer, Pugh, and another private first class.  Plummer brought the marijuana along, and it was smoked by Pugh, Appellant, Plummer, and Brumley.

Private Brian T. Grimm also testified on behalf of the Government. He corroborated Pugh's testimony that the group, including Appellant, went to Covington, Kentucky, in April 1995, where they partied, drank, and smoked marijuana. This testimony was cut short because the military judge would not allow the Government to refresh his memory about his statement he made to the Criminal Investigation Command (CID) on June 20, 1996. Private Grimm then testified about the statement.

### DEFENSE CASE

To counter the Government's case, the defense counsel used a multiple approach to defend against the charges in this case. First, the defense presented evidence of a negative urinalysis sample which was taken close in time to one of the supposed "marijuana" smoking events. Second, the defense presented several friends and acquaintances of Appellant and his girlfriend to testify they never observed Appellant consuming marijuana. Third, in an attempt to negate Appellant's admissions to law enforcement officials, the defense attempted to demonstrate that Appellant's statements were coerced and thus, unreliable.

The defense introduced Defense Exhibit B, which was a urinalysis sample taken on May 29, 1996, showing a negative result. A positive result for marijuana in urine is dependent on when the consumption occurred in relation to rendering the

sample and the amount of consumption.  A negative urinalysis would not necessarily show Appellant did not ingest marijuana on May 14 or from May 17 through May 19.  An expert testified that there might be a positive result within a six-day window, but not within a ten-day window.  The expert could not be positive without knowing more about the regularity of the consumption of marijuana and the potency of the marijuana or THC (tetrahydrocannabinol).

Appellant's girlfriend testified that Pugh and Appellant did visit her in her hometown of Covington, Kentucky, but none of them used marijuana.  She did admit that she talked to Appellant the night before her testimony and discussed the case with him.

The defense then called Mr. Paul William Plageman, who has known Melissa for about five or six years and lived in Covington for twelve years.  He went to school with Appellant and Melissa. He remembered Appellant visiting Covington a couple of weekends in July, but he also remembered some visits from February 2 through February 4, but he testified that there was no involvement with marijuana.

Other individuals present on those weekends included Timothy Feeback and others.  Mr. Feeback testified he lived in Crescent Springs, Kentucky, and knew Appellant, Appellant's girlfriend, and Paul Plageman.  He also remembered a weekend

that Appellant visited home in February 1996; Feeback admitted drinking, having a good time, but he testified that no one was smoking marijuana.  He mentioned the presence of Brumley, Pugh, and Appellant.  He also testified that Appellant had visited with Pugh and Brumley the weekend of May 17, 1996, through May 19, 1996.  He also mentioned another individual who was there that weekend was Krista Normeir.  Again there was no smoking of marijuana smoked during that weekend.

Staff Sergeant Clay Starner testified for the defense.  He knew Appellant from 1994 through 1995, when they were involved in preparing for a marathon.  That preparation continued from October 1994 through October 1995.  This evidence was submitted to establish that Appellant was absent from some of the weekends mentioned by Grimm and Pugh.

Appellant was the last witness to testify for the defense.  He testified concerning the statement that was taken by Staff Sergeant Deal.  Appellant indicated that he was advised of his Article 31, UCMJ, rights, and that he initially invoked his rights and was allowed to leave the police station.  He went to the barracks and thought about it for an hour and a half to two hours and then went back "to tell them what they want[ed] to hear."  In his statement, Appellant admitted that he was smoking marijuana at the Aquia Landing Campground.  He also implicated his friend, Pugh, in the marijuana use as well as several

6

others.  Sergeant Wikel encouraged Appellant to make the statement, telling him:  "This is better you do it this way.  The CO wants cooperation."  Both Wikel and Deal told him:  "Once the CO sees that you're cooperating with our investigation nothing is going to happen to you from here; it'll just [be] a slap on the wrist."

Appellant admitted on the witness stand that he lied about smoking marijuana to avoid confinement.  The military judge asked Appellant why he didn't come forward earlier about Pugh's marijuana use if he knew that the Marine Corps didn't tolerate marijuana.  He testified he did not want to squeal on his friends, as that would not be fair.  He explained that the reason he reported his friends when he went back to see Wikel and Deal was to get the investigators off his back.  The military judge refused to let the members ask questions about whether Appellant admonished his friends about the no-tolerance policy in the Marine Corps and whether he saw Pugh smoking marijuana earlier.

CLOSING ARGUMENT

Trial counsel's comment on Appellant's failure to contact a lawyer after invoking his right to counsel and stopping the police interview was as follows:

> He says he gave a statement to avoid confinement.  Well, let's look at that.  I mean I think that's an interesting statement.  Let's -- this is an important

7

analysis that I think needs to be considered. <u>He gets his first rights warning from Master Sergeant Crecilius and he invokes his right, he says, I want to see an attorney</u>. And he leaves the premises and what does he do? He doesn't see an attorney, he goes to the barracks. <u>What would most people do in that situation if an individual was truly innocent? Wouldn't they go see a lawyer and get some sort of legal protection? Would they come back and admit to guilt without the benefit of legal advice?</u> What is more reasonable is that if he knows he's guilty, he understands that there may be witnesses out there who can prove he's guilty, he has an incentive to come back and try to minimize things by being as cooperative as possible and hope that he gets some sort of leniency. <u>If he was innocent, the government is arguing, he would have gone and seen a lawyer, and used that shield</u>.

Emphasis added.

The United States Navy-Marine Corps Court of Criminal Appeals said:

The trial counsel's argument regarding the accused's waiver of his rights and his written statement, taken in the context of the defense factual case, was not patently unreasonable. It is not error for the Government to comment upon the accused's failure to support his claims. <u>United States v. Webb</u>, 38 M.J. 62, 66 (C.M.A. 1993).[1]

The second part of the assigned issue concerns trial counsel's comments on Appellant's failure to call certain witnesses to support his defense. In his closing argument, the trial counsel stated:

It is interesting to note the absence of certain witnesses here today. You have before you a statement identifying Brumley, Lincoln, and Plummer, as being

---

[1] <u>United States v. Haney</u>, No. 9900878, slip op. at 5 (N-M. Ct. Crim. App. June 21, 2004).

> present at the scene of the Aquia Landing use.  And
> they certainly could have come in and supported what
> Lance Corporal Haney has said to you.  The question
> becomes, why are they not here?

Later, after the defense counsel argued, trial counsel returned

to this point:

> The third point, and final point, that I want to make
> is the defense counsel still has not provided an
> explanation as to why Brumley, Lincoln, Plummer, were
> not here to testify for their client ---
>
> MJ:  Captain Rosenberg, I did not say anything the
> first time you mentioned this, and the defense did not
> object, but I'm going to make a sua sponte ruling not
> to allow you to make this kind of argument.  The
> burden of proof is on the government to establish each
> and every element of the offense.  The defense has no
> requirement to disprove any of the elements or to
> bring any evidence forward.
>
> The members are instructed not to allow this type of
> argument to shift the burden to the defense and you
> must not speculate as to why various witnesses named
> are not present.  The defense is under no obligation
> to bring forth any witness.
>
> TC:  I understand your ruling, ma'am.

The prosecutor's comment on Appellant invoking his rights

was designed to show that his statement, the second time he went

to the CID office, was not coerced.  The first time he was at

the CID office, he invoked his rights and was released and

allowed to go back to the barracks.  He then voluntarily

returned to the CID office.  The aim of the prosecutor's

argument was to rebut Appellant's suggestion that the confession

the second time was coerced.  Appellant was not coerced -- he

could have stopped the interrogation at any time, just as he did the first time, by invoking his right to counsel. In addition, the prosecutor's comment about missing witnesses was meant to be facetious, since the trial counsel was essentially saying that the defense had already called numerous witnesses to say they had never saw Appellant use marijuana -- why not call some more witnesses to say essentially the same thing?

## DISCUSSION -- ISSUE I

The Government, in pointing out that Appellant knew that he could obtain counsel, was making the classic rebuttal argument to the defense theory of the case. The defense theory was that Appellant's confession was involuntary and should be rejected. The Government's argument was in response to this theory. The Government counsel was trying to demonstrate that Appellant was well aware he could stop the interview process by invoking his rights at any point, because he had already successfully done just that when they initially talked to him.

In general, the majority is correct that the invocation of rights under the Fifth Amendment or Article 31, UCMJ, would be inadmissible against an accused. But, when an appellant argues there was a coercive atmosphere, the government should be allowed to negate that argument by presenting evidence of the prior warnings, invocation of rights, termination of the interrogation, and the appellant's voluntarily reinitiating the

interrogation.  The right against self-incrimination may not be used as a sword to prevent the Government from putting in context what actually occurred and to defend against Appellant's assertion that his statement was coerced.

OPENING STATEMENTS

The defense may open the door for rebuttal evidence in the opening statement,[2] direct examination,[3] cross-examination,[4] or closing argument.[5]  When the facts mentioned in opening argument are pursued throughout the trial, the door is "effectively open[] for a great deal of rebuttal evidence."[6]

In McAnderson, the defendants, all members of a Chicago street gang, were convicted of various roles in a conspiracy to commit terrorism.[7]  In his opening statement, counsel for one of the defendants described "'the El Rukns . . . [as] a group of people who banded together for brotherhood, discipline in their

---

[2] See, e.g., United States v. Houser, 36 M.J. 392, 400 (C.M.A. 1993); United States v. Franklin, 35 M.J. 311, 317 (C.M.A. 1992).  But see United States v. Turner, 39 M.J. 259, 262 (C.M.A. 1994) (stating that "nothing more than a single passing comment during defense counsel's opening statement" may not be enough without more, to open the door) (emphasis added).
[3] See, e.g., United States v. Beason, 220 F.3d 964, 967 (8th Cir. 2000) (after the defense sought to take advantage of the Bruton rule -- the court held this opened the door for government rebuttal evidence).
[4] United States v. Havens, 446 U.S. 620, 627 (1980).
[5] United States v. Young, 470 U.S. 1, 12 (1985); United States v. Robinson, 485 U.S. 25, 32 (1988); Darden v. Wainwright, 477 U.S. 168, 178-82 (1986).
[6] United States v. McAnderson, 914 F.2d 934, 946 (7th Cir. 1990).
[7] Id. at 938.

lives, lives that were often chaotic, to put God in their

lives.'"[8]  Counsel next stated that some members of the El Rukns,

> have been in trouble in the past.  Some are still in
> trouble.  But that's no different than any other
> organization whether it be lawyers, a group of Catholics,
> or Jews, or Protestants or Muslims; it's no different than
> any other organization.  I venture to say even the Knights
> of Columbus have a few people in trouble every now and
> again.

Id.  Counsel for the other defendants made similar assertions in

their opening statements.[9]

Thus, in McAnderson, the role of the organization was

pursued not only in the opening statement, but as part of the

defense case.  In rebuttal to these assertions, the prosecution

introduced evidence of drug transactions between the co-

conspirators and undercover agents.[10]  Some of this was

introduced as part of the prosecution's case-in-chief.[11]  The

exact rebuttal was not set forth in the opinion.  The evidence

of these drug transactions was meant to impeach the defendant's

contention that the organization was "fundamentally [a]

religious organization."[12]

In addition to the opening statement inviting a response,

direct examination may do the same.  One of the most recent

examples is Beason.  In Beason, the defense sought to take

---

[8] Id. at 945.
[9] Id.
[10] Id. at 945-46.
[11] Id. at 945 n.4.
[12] Id. at 946.

advantage of the Bruton rule, which provides that at a joint trial, a co-defendant's confession that implicates the other defendant is not admissible against that other defendant. Id. at 967; see Bruton v. United States, 391 U.S. 123, 126 (1968). The Supreme Court held in Bruton that in limine instructions would be inadequate because co-defendant B cannot test by cross-examination the evidence set forth in A's confession.[13] In Beason, the Government had introduced evidence that Beason was the kingpin who was selling drugs from his truck, hiding hundreds of thousands of dollars in its inside compartments.[14] Like most drug kingpins, he had some runners.[15] One of these was Washington. At trial, the defense asked the agent, who took a statement from Washington, whether the information they obtained regarding who knew where the money was in the truck, came from Washington, who had a prior drug arrest.[16] The government argued, and the trial judge agreed, that this opened the door for the agent to testify about other information from Washington that revealed the ownership of the truck, how the money was collected, how the money was given to Washington, and who was given directions concerning where to hide it in the truck.[17]

---

[13] 391 U.S. at 132.
[14] Beason, 220 F.3d at 966.
[15] Id. at 967-68.
[16] Id.
[17] Id.

Just as the opening statement, direct examination, or cross-examination may open the door, or unlock the evidence door, closing arguments may invite a response from an opponent. In Robinson,[18] the defense counsel in his closing argument told the jury that the government had not allowed the defendant to explain his side of the story and had breached its "duty to be fair."

After this argument, the prosecutor, in a hearing outside the presence of the jury, contended that the defense had opened the door.[19]  The judge agreed stating:

> I will tell you what, the Fifth Amendment ties the
> Government's hands in terms of commenting upon the
> defendant's failure to testify.  But that tying of
> hands is not putting you into a boxing match with your
> hands tied behind your back and allowing him
> to punch you in the face.  That is not what it was
> intended for and not fair.  I will let you say that
> the defendants had every opportunity, if they wanted
> to, to explain this to the ladies and gentlemen of the
> jury.[20]

The defense did not object, and in rebuttal, the prosecutor stated that the government had complied with its obligation to "play fair."

> [Defense counsel] has made comments to the extent
> the Government has not allowed the defendants an
> opportunity to explain.  It is totally unacceptable.
> He explained himself away on tape right into an
> indictment.  He explained himself to the insurance
> investigator, to the extent that he wanted to.  He

---

[18]  485 U.S. at 27.
[19]  Id. at 28.
[20]  Id. (quotation marks omitted).

could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain.[21]

The court noted that "[d]efense counsel did not object to this closing and did not request a cautionary instruction. Nonetheless, the court included in the jury instruction the admonition that 'no inference whatever may be drawn from the election of a defendant not to testify.'"[22]

In Young, the Supreme Court indicated that in order to "right the scale" the prosecutor responded to the defense counsel's closing argument by expressing his personal opinion of the defendant's guilt, vouched for his own credibility and the prestige of the prosecutor's office, and exhorted the jury to "do [your] job." The Supreme Court did not condone these remarks but found they did not constitute plain error.[23] The role of the appellate court is to weigh the impact of such remarks taking into account what prompted the remarks.[24]

However, the better remedy is for the trial judge "to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond."[25] The Supreme Court in Young stated:

---

[21] Id. (quotation marks omitted).
[22] Id. at 28-29.
[23] 470 U.S. at 13.
[24] Id.
[25] Id.

15

"Invited responses" can be effectively discouraged by prompt action from the bench in the form of corrective instructions to the jury and, when necessary, an admonition to the errant advocate.

. . . Arguably defense counsel's misconduct could have warranted the judge to interrupt the argument and admonish him thereby rendering the prosecutor's response unnecessary.[26]

Justice Brennan, writing for himself and two others, dissenting in part and concurring in part, stated "I agree fully with the Court's conclusion that federal prosecutors do not have a 'right' of reply to defense improprieties, but must instead object to the trial judge and request curative action."[27] However, he "completely disagree[d]" with the majority's having apparently adopted an "invited error" analysis.[28]  He noted the majority "rejects this asserted 'right' of reply, emphasizing instead that prosecutors have no 'license to make otherwise improper arguments' in response to defense rhetoric . . . ."[29]

The Supreme Court concluded in Robinson that it did not have to address the issue of plain error because there was no error in the case.[30]  Justice Marshall (joined by Justice

---

[26] Id. (citation omitted)
[27] Id. at 22 (Brennan, J., dissenting in part and concurring in part).
[28] Id.
[29] Id. at 23 (Brennan, J., dissenting in part and concurring in part).
[30] Robinson, 485 U.S. at 30.

Brennan) dissented because he believed the prosecution's comments violated the Fifth Amendment.[31]

While Griffin v. California,[32] holds that the prosecutor may not on his own initiative, comment on the right to remain silent, the Supreme Court in Robinson found no violation of the privilege against compulsory self-incrimination where "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel."[33]  In holding there was no plain error, the Supreme Court in Young looked at the defense counsel's opening salvo, the jury's understanding of the response, and the overwhelming evidence of guilt, and found there was no prejudice to the defendant.[34]

Likewise, in Darden,[35] the Supreme Court, in a 5-4 opinion, examined the "invited error" doctrine and again found that, although the defendant's trial was not perfect, it was not fundamentally unfair.  "Much of the objectionable content was invited by or was responsive to the opening summation of the defense."[36]  Parts of that summation were as follows:

> The Judge is going to tell you to consider the evidence or the lack of evidence.  We have a lack of evidence, almost

---

[31] Id. at 37-45 (Marshall, J., dissenting).
[32] 380 U.S. 609, 615 (1965).
[33] Robinson, 485 U.S. at 32.
[34] See 470 U.S. at 17-20.
[35] 477 U.S. at 183.
[36] Id. at 182.

criminally negligent on the part of the Polk County Sheriff's Office in this case. You could go on and on about it. . . . They took a coincidence and magnified that into a capital case. And they are asking you to kill a man on coincidence. . . . The first witness that you saw was Mrs. Turman, who was a pathetic figure; who worked and struggled all of her life to build what little she had, the little furniture store; and a woman who was robbed, sexually assaulted, and then had her husband slaughtered before her eyes, by what would have to be a vicious animal. And this murderer ran after him, aimed again, and this poor kid with half his brains blown away. . . . It's the work of an animal, there's no doubt about it. So they come on up here and ask Citrus County people to kill the man. You will be instructed on lesser included offenses. . . . The question is, do they have enough evidence to kill that man, enough evidence? And I honestly do not think they do.[37]

In United States v. Grady,[38] this Court indicated that regardless of who initiated the argument as to command policies, the military judge has a sua sponte duty to give a curative instruction. However, this Court distinguished Grady in United States v. Kropf.[39]

Again, in Robinson,[40] the Supreme Court held that the prosecutor's direct reference to the defendant's failure to testify was not error because it was in response to the defense counsel's argument that the government would not let the defendant testify.

In the instant case, the opening statement that defense counsel made and the cross-examination of the agent, Deal, were

---

[37] Id. at 179 nn.5-8 (citations and quotation marks omitted).
[38] 15 M.J. 275 (C.M.A. 1983)
[39] 39 M.J. 107, 109 (C.M.A. 1994).
[40] 485 U.S. at 32.

far from "single passing" comments.[41]  The courts have recognized the door may be open by either side.  See, e.g., Shafer v. South Carolina, 532 U.S. 36, 37-39 (2001) (finding that the prosecutor's closing argument that Shafer and his two accomplices "might come back" opened the door to show future dangerousness and required an instruction of life without parole); United States v. Chance, 306 F.3d 356, 386-87 (6th Cir. 2002) (holding that once defense counsel attempted to paint the picture of the appellant as a good law enforcement officer, the prosecution was entitled to "adduce some evidence to rebut [that] implication").  The defendant may not use his constitutional rights as a "shield" to "prevent the Government from contradicting the untruths and reasonable inferences that the fact finders could logically draw from the defense cross-examination."[42]

The prosecution's argument concerning the rights warnings, invocation of the rights, and termination of the interrogation was clearly fair rebuttal to show that Appellant's confession was not coerced.  Certainly, it rebutted the defense's theory from the beginning of the trial, thus defense counsel did not object.  Although the trial counsel's comments implying that Appellant's failure to consult with an attorney was proof of

---

[41] See Turner, 39 M.J. at 262.
[42] United States v. Gilley, 56 M.J. 113, 125 (C.A.A.F. 2001) (Crawford, C.J., concurring in part).

guilt went beyond fair rebuttal, the error was harmless beyond a reasonable doubt, in light of the strength of the Government's case, which was supported by the testimony of two witnesses and Appellant's admission. In addition, we must consider all of the trial counsel's comments in the context of a response to the defense case that was presented. The comments were harmless beyond a reasonable doubt.

## CONCLUSION

While I agree with the majority as to the disposition of Issues I and II, I disagree with the majority's analysis of both issues. I would affirm the decision of the lower court. I find no merit in either issue. I also write separately to disassociate myself from this Court's analysis of Issue II, which is based on its prospective rule set forth in United States v. Moreno, 63 M.J. 129, 135-41 (C.A.A.F. 2006), and its misapplication of the Barker v. Wingo, 407 U.S. 514, 530 (1972), test. See Moreno, 63 M.J. at 144 (Crawford, J., concurring in part and dissenting in part).

20

<u>United States v. Haney</u>, No. 05-0047/MC

EFFRON, Judge (concurring in part and in the result):

I concur in the lead opinion except for Part III, which addresses post-trial delay. Because any error was harmless beyond a reasonable doubt, we need not reach the question of whether Appellant has suffered a denial of due process from any delay. See <u>United States v. Allison</u>, 63 M.J. 365, 371 (C.A.A.F. 2006).

United States v. Haney, No. 05-0047/MC

BAKER, Judge (concurring in part, dissenting in part, and concurring in the result):

The defense theory of coercion opened the door to rebuttal. Fair rebuttal included the Government's argument that when Appellant said he wanted to see a lawyer, he did not in fact see a lawyer. This suggested for the purposes of rebuttal that Appellant may not have felt the degree of coercion he subsequently argued compelled him to sign a false confession. It is also noteworthy that Appellant, not the Government, initially opened the door to this line of reference.

That is not all trial counsel did. Trial counsel also stated "[i]f he was innocent, the government is arguing, he would have gone and seen a lawyer, and used that shield." That is a bridge too far, for it does not address and rebut the claim of false confession, nor was it "fair response" to defense counsel's argument. It was improper comment on the right to counsel as evidence of guilt or innocence, not lack of coercion. See United States v. Riley, 47 M.J. 276, 279 (C.A.A.F. 1997) (quoting United States v. Moore, 1 M.J. 390, 391 (C.M.A. 1976)). While it is true that a person who confesses to a crime they did not commit "falsely confesses," that does not mean that any argument addressed to innocence rebuts a claim of false confession. In our system, the exercise of the right to counsel is not proof of guilt or innocence.

Since Appellant did not open that door, trial counsel's argument was not fair rebuttal.  It was obvious error.  The principle at stake is fundamental to a system of justice premised on the right to counsel and the adversarial role of lawyers.  Therefore, this Court should not duck the issue, but should say so.

Nonetheless, I conclude that this error was harmless beyond a reasonable doubt for the reasons stated in the lead opinion.